ACCEPTED
12-15-00014-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
7/23/2015 11:25:40 AM
CATHY LUSK
CLERK

**ORAL ARGUMENT REQUESTED**

No. 12-15-00014-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
7/23/2015 11:25:40 AM
CATHY S. LUSK
Clerk

_____

# COURT OF APPEALS

for the

## TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

**East Texas Medical Center d/b/a East Texas Medical Center
Emergency Medical Services**
Appellant,

v.

**Jody Delaune, Individually and as Personal Representative of the Estate of
Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D, Minors**
Appellees.

_____

Appeal from Cause No. 13-0984-A
7TH District Court, Smith County, Texas
Honorable Kerry L. Russell, Presiding Judge

_____

## APPELLANT'S REPLY BRIEF ON THE MERITS
_____

Russell G. Thornton
THIEBAUD REMINGTON THORNTON BAILEY LLP
Two Energy Square
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206
(214) 954-2200 – Telephone
(214) 754-0999 – Telecopier

ATTORNEYS FOR DEFENDANT – APPELLANT
East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services

July 23, 2015

## LIST OF PARTIES AND COUNSEL

In order that members of the Court may determine disqualification or recusal, Appellant certifies that the following is a complete list of the names and addresses of parties to this appeal and their counsel:

**APPELLEES:** Jody Delaune, Individually and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D., Minors

**COUNSEL FOR APPELLEES:** Mr. Ryan Krebs, M.D., J.D.
THE LAW OFFICE OF RYAN KREBS
805 W. 10th Street, Suite 300
Austin, Texas 78701

**APPELLANT:** East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services

**COUNSEL FOR APPELLANT:** Russell G. Thornton (Appeal)
Stan Thiebaud (Trial)
R. Gregg Byrd (Trial)
THIEBAUD REMINGTON THORNTON
  BAILEY LLP
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................ iii

REPLY ARGUMENT .......................................................................................3

    I.      Necessary Underlying "Actionable Tort" is Absent ...........................3

    II.     Appellees Fail to Rebut ETMC's Supportive Authority That There is Legally Insufficient Evidence of the Applicable Standard of Care and Breach by ETMC ............................................10

    III.    ETMC's Case Law Shows Appellees' Standard of Care and Breach Evidence is Legally Insufficient .............................................15

CONCLUSION ...............................................................................................19

PRAYER ........................................................................................................21

CERTIFICATE OF COMPLIANCE ................................................................22

CERTIFICATE OF SERVICE .........................................................................23

APPENDIX .............................................................................................. TAB

    A.    *Mackey v. U.P. Enterprises, Inc.,*
        935 S.W.2d 446 (Tex. App.—Tyler 1996, no pet.)

    B.    *Patino v. Complete Tire, Inc.,*
        158 S.W.3d 655 (Tex. App.—Dallas 2005, pet. denied)

    C.    *Allsup's Convenience Stores, Inc. v. Warren,*
        934 S.W.2d 433 (Tex. App.—Amarillo 1996, writ denied)

    D.    *Lermon v. Minyard Food Stores, Inc.,*
        2014 Tex. App. LEXIS 12498 (Tex. App.—Dallas)(Nov. 19, 2014) (pet. denied)(mem. op.)

# INDEX OF AUTHORITIES

**UNITED STATES DISTRICT COURT CASES:**

*Zidell v. Morris,*
2013 U.S. Dist. LEXIS 264432 (N.D. Tex. 2013) ............................................4, 6, 7

**TEXAS SUPREME COURT CASES:**

*Cash America International, Inc. v. Bennett,*
35 S.W.3d 12 (Tex. 2000) .............................................................................7, 8

*Jackson v. Axelrad,*
221 S.W.3d 650 (Tex. 2007) ..................................................................................8

**TEXAS COURTS OF APPEALS CASES:**

*Allsup's Convenience Stores, Inc. v. Warren,*
934 S.W.2d 433 (Tex. App.—Amarillo 1996, writ denied) ...................................15

*Brown v. Swett & Crawford of Texas, Inc.,*
178 S.W.3d 373 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ............................9

*Ching v. Methodist Children's Hospital,*
134 S.W.3d 235 (Tex. App.—Amarillo 2003, pet. denied) .............................11, 14

*Denton Regional Medical Center v. Lacroix,*
947 S.W.2d 941 (Tex. App.—Fort Worth 1997, pet. dism'd by agmt.) ...................3

*Dill v. Fowler,*
255 S.W.3d 681 (Tex. App.—Eastland 2008, no pet.) .............................................8

*Durham Transportation Inc. v. Valero,*
897 S.W.2d 404 (Tex. App.—Corpus Christi 1995, writ denied) ..............11, 12, 14

*Gonzales v. Willis,*
995 S.W.2d 729 (Tex. App.—San Antonio 1999), *overruled in part, on o.g.,*
*Hoffman-LaRoche, Inc. v. Zeltwanger,* 144 S.W.3d 438 (Tex. 2004) ..................4, 9

*Greater Houston Transportation v. Zrubeck,*
850 S.W.2d 579 (Tex. App.—Corpus Christi 1993, writ denied) ..............11, 12, 14

*Latimer v. Memorial Hermann Hosp. Sys.,*
2011 Tex. App. LEXIS 423 (Tex. App.—Houston [14th Dist.])(Jan. 20, 2011)(no pet.)(mem. op.) .................................................................................................4

*Lermon v. Minyard Food Stores, Inc.,*
2014 Tex. App. LEXIS 12498 (Tex. App.—Dallas)(Nov. 19, 2014)(pet. denied)(mem. op.) ..............................................................................16, 17, 18

*Mackey v. U.P. Enterprises, Inc.,*
935 S.W.3d 446 (Tex. App.—Tyler 1996, no pet.) .................................................15

*Nowzaradan v. Ryans,*
347 S.W.3d 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ...........................8

*Patino v. Complete Tire, Inc.,*
158 S.W.3d 655 (Tex. App.—Dallas 2005, pet. denied) .......................................15

**OTHER REFERENCES:**

Edgar Sales, Texas Torts & Remedies, §4.01[4][d] .................................................4

No. 12-15-00014-CV

_____

# COURT OF APPEALS

for the

TWELFTH DISTRICT OF TEXAS

Tyler, Texas

_____

**East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services**

*Appellant,*

v.

**Jody Delaune, Individually and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D., Minors,**
*Appellees.*

_____

Appeal from Cause No. 13-0984-A
7th Judicial District Court, Smith County, Texas
Honorable Kerry L. Russell, Presiding Judge

_____

**TO THE TWELFTH COURT OF APPEALS:**

Appellant East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services, Defendant in Cause No. 13-0984-A in the 7th Judicial District Court of Smith County, Texas, Honorable Kerry L. Russell presiding, respectfully submits its Reply Brief on the Merits. Appellees are Jody Delaune, Individually and as Personal Representative of the Estate of

**1**

Crystal Delaune, Deceased; and as Next Friend of D.D., D.D. and DA.D., Plaintiffs

in the district court.

**REPLY ARGUMENT**

## I.   NECESSARY UNDERLYING "ACTIONABLE TORT" IS ABSENT:

Appellees do not dispute – and cannot dispute – that their sole claim against ETMC is for an alleged failure to train Ms. Moore and Ms. Spurgers on the use of restraint in patients like Ms. Delaune (*See,* Appellant's Brief on the Merits, pages 6-7).

### A.   *Lacroix* **Is Not Relevant or Applicable:**

Appellees argue that *Denton Regional Medical Center v. Lacroix,* 947 S.W.2d 941 (Tex. App.—Fort Worth 1997, pet. dism'd by agmt.) is applicable and supports their contention the existence of an actionable tort by Ms. Moore or Ms. Spurgers is not an essential element of their failure to train claim (Brief of Appellees, pages 7-8). *Lacroix* is not relevant or applicable to this appeal because it does not involve the failure to train, or some other dependent tort. *Id.* at 949-50.

### B.   **Existence Of An Actionable Tort Is An Essential Element Of Appellees' Failure To Train Claim:**

Appellees' contention that dependent torts only require that a "recognized injury" was suffered as a direct result of an employer's conduct and that an "actionable tort" by the employee(s) is not required is flat wrong (*See,* Brief of Appellees, page 10).   The applicable case law clearly and unequivocally establishes that in order to prevail on a dependent tort like Appellees' failure to train claim against ETMC, claimant must show the employee(s) in question

**3**

committed an "actionable tort." *See, Zidell v. Morris,* 2013 U.S. Dist. LEXIS 264432 *23-24 (N.D. Tex. 2013)(to prevail on claim of negligent training, plaintiff must "establish…that the employee ***committed an actionable tort***…")(applying Texas law)(emphasis added); *Latimer v. Memorial Hermann Hosp. Sys.,* 2011 Tex. App. LEXIS 423 *10 (Tex. App.—Houston [14th Dist.])(Jan. 20, 2011)(no pet.)(mem. op.)(No negligent supervision claim against Hermann Hospital because "there is no separate ***actionable tort*** [by the hospital's employee] to support the negligent supervision claim")(emphasis added); *Gonzales v. Willis,* 995 S.W.2d 729, 740 (Tex. App.—San Antonio 1999, *overruled in part, on o.g., Hoffman-LaRoche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 447-48 (Tex. 2004)("Because [plaintiff] failed to establish [the employee] ***committed an actionable tort***, her negligence claims [negligent hiring, retention, training and supervision] ***are precluded as a matter of law***.")(emphasis added)

In fact, authority cited by Appellees in their brief recognizes that if Ms. Moore or Ms. Spurgers did not commit an actionable tort on the occasion in question, Appellees have not been injured in the eyes of the law and there is no proximate cause because ETMC's alleged failure to train did not cause Appellees a legally compensable injury (*See,* Brief of Appellees, page 10 (quoting Edgar Sales, Texas Torts & Remedies, §4.01[4][d], at pages 4-10)). Accordingly, the commission of an actionable tort by Ms. Moore or Ms. Spurgers is an essential

element of Appellees' failure to train claim against ETMC. If the essential actionable tort element is absent, there is no proximate cause because ETMC's alleged failure to train Ms. Moore or Ms. Spurgers did not cause Appellees to suffer a legally compensable injury. Put another way, if Ms. Moore or Ms. Spurgers did not cause or inflict a legally compensable injury on Appellees, ETMC's alleged failure to train Ms. Moore or Ms. Spurgers cannot be a proximate cause of any injury to Appellees.

Appellees sued Ms. Moore and Ms. Spurgers for negligence in caring for Ms. Delaune (CR 6; 1 CR 10). On July 29, 2014, the trial court dismissed with prejudice Appellees' negligence claims against Ms. Spurgers and Ms. Moore (CR 365, 2 CR 119). Thus, on July 29, 2014, the trial court determined as a matter of law that Ms. Spurgers and Ms. Moore did not commit an actionable tort in connection with their care and treatment of Ms. Delaune (CR 365-66; 2 CR 119-20). As such, Appellees could not (and cannot) establish that essential element of their failure to train claim against ETMC.

Appellees argue that because their negligence claim against Ms. Spurgers' and Ms. Moore is judged under Texas law by a willful and wanton standard and Ms. Moore and Ms. Spurgers were not "absolved of ordinary negligence," this is somehow relevant to or excuses Appellees' inability to (and failure to) establish Ms. Moore and Ms. Spurgers committed an actionable tort (*See,* Brief of

5

Appellees, page 13). Appellees' argument is flawed because a dependent tort like negligent hiring is not dependent on the "ordinary negligence" of an employee; it is dependent on the commission of an "actionable tort" by an employee. The bottom line is that if Ms. Moore or Ms. Spurgers did not commit an actionable tort, for whatever reason, Appellees cannot recover from ETMC for negligent training. *Zidell v. Morris,* 2013 U.S. Dist. LEXIS 26432 (N.D. Tex. 2013), illustrates this point.

In *Zidell,* plaintiff alleged that two Bureau of Prison employees, Morris and Brown, assaulted him and that the United States was liable to him for the negligent hiring, training, retention and supervision of Morris and Brown. *Id.* at *1-2, *21, *23-24. The court held that the actions of Morris and Brown fell within an immunity privilege provided under the TEXAS PENAL CODE and, therefore, Morris and Brown did not commit an actionable tort against plaintiff. *Id.* at *22-24.

The court then discussed that for plaintiff to prevail on his claim of negligent hiring, training, retention and supervision, "the employee *must have committed an actionable tort* against the plaintiff." *Id.* at *24 (emphasis added). The court then stated, "[h]ere, the court has determined that Morris and Brown committed no tort against plaintiff. Accordingly, plaintiff's claim of negligent hiring, training, retention, and supervision fails as well." *Id.*

6

*Zidell* directly addresses and rebuts Appellees' argument that because Texas law places a higher burden of proof on Appellees' negligence claim against Ms. Moore and Ms. Spurgers (or effectively makes them immune from suit as argued by Appellees), the trial court's dismissal of their negligence claim against Ms. Moore and Ms. Spurgers does not bar their ability to recover from ETMC (Brief of Appellees, page 11). *Zidell* shows that because Ms. Moore and Ms. Spurgers did not commit an actionable tort as a matter of law, Appellees cannot establish a failure to train claim against ETMC. *Id.*

Appellees' argument that the Texas Supreme Court's holding in *Cash America International, Inc. v. Bennett,* 35 S.W.3d 12 (Tex. 2000) is relevant and applicable is also erroneous. Appellees cite *Cash America International* as standing for the propositions (1) that abrogation of a common law cause of action by reason of statutory enactment is disfavored, (2) that the existence of statutory damage-immunity cannot prevent an actionable tort from occurring, and (3) that any statutory tightening of Appellees' right-to-recover against Ms. Moore and Ms. Spurgers would abrogate a common law right to recover from ETMC (Brief of Appellees, pages 7, 11, 12). Specifically, Appellees cite to page 16 of the *Cash America International* opinion as where the Texas Supreme Court makes these holdings and rulings. While it is true that *Cash America International* stands for the first proposition – that Texas law disfavors a statute that deprives a person of a

common law right – *Cash America International* does not stand for the second and third propositions. *Id.* at 16.

*Cash America International* has no relevance or application to this matter because there is no abrogation or deprivation of a common law right by statute here. Section 75.152 of the TEXAS CIVIL PRACTICE & REMEDIES CODE does not abrogate or deprive any claimant of a common law right to sue for negligence, as claimed by Appellees. It simply places a different legal standard of care on emergency medical services providers in certain circumstances. *See, Dill v. Fowler,* 255 S.W.3d 681, 683 (Tex. App.—Eastland 2008, no pet.)(citing *Jackson v. Axelrad,* 221 S.W.3d 650, 655 (Tex. 2007))(interpreting similar willful and wanton standard of proof applicable to emergency room services under Section 74.153 of the TEXAS CIVIL PRACTICE & REMEDIES CODE). Thus, what is at issue is a different applicable standard of proof, not the abrogation or deprivation of a common law right. *See, Nowzaradan v. Ryans,* 347 S.W.3d 734, 741-42 (Tex. App.—Houston [14th Dist.] 2011, no pet.)(interpreting similar willful and wanton standard of proof applicable to emergency room services under Section 74.153 of the TEXAS CIVIL PRACTICE & REMEDIES CODE).

One cannot dispute with any degree of credibility that under Texas law a dependent tort like Appellees' negligent training claim against ETMC is dependent on Ms. Moore or Ms. Spurgers committing an "actionable tort." On July 29, 2014,

the trial court determined that as a matter of law neither Ms. Moore nor Ms. Spurgers committed an actionable tort. For this reason, Appellees could not establish that essential element of their negligent training claim against ETMC.

Just as important is Appellees' failure to prove and secure a finding at trial that Ms. Moore or Ms. Spurgers were negligent (committed an actionable tort) on the occasion in question. In fact, Appellees failed to provide any evidence at trial would or could support a finding that Ms. Moore's or Ms. Spurgers' actions constituted even ordinary negligence. In order to prevail on their dependent tort failure to train claim, Appellees *had to prove at trial* that Ms. Moore or Ms. Spurgers committed an actionable tort in connection with their care and treatment of Ms. Delaune. *See, Brown v. Swett & Crawford of Texas, Inc.,* 178 S.W.3d 373, 384 (Tex. App.—Houston [1st Dist.] 2005, no pet.)(holding that to recover on a negligent supervision claim, a plaintiff must prove that the employee committed an actionable tort); *Gonzales*, 995 S.W.2d at 740 ("Because [plaintiff] *failed to establish* [the employee] *committed an actionable tort*, her negligence claims [negligent hiring, retention, training and supervision] *are precluded as a matter of law*.")(emphasis added).

Wholly absent from the appellate record is any finding or stipulation that Ms. Moore's or Ms. Spurgers' actions were negligent. Also wholly absent from the record is any evidence of either the standard of care applicable to an emergency

medical technician or paramedic like Ms. Moore or Ms. Spurgers in treating someone like Ms. Delaune on the occasion in question, or a breach of the standard of care applicable to an emergency medical technician or paramedic in treating a patient like Ms. Delaune on the occasion in question. Thus, even if an ordinary negligence standard applies, – which it does not – Appellees still failed to establish the commission of an actionable tort by Ms. Moore or Ms. Spurgers (or to provide any evidence upon which such a finding could have been made), an essential element of their failure to train claim against ETMC.

For the above reasons, there is no evidence of an essential element (proximate cause) of Appellees' failure to train claim against ETMC. Accordingly, the Tyler Court of Appeals should reverse the trial court's December 23, 2014 Final Judgment against ETMC and in favor of Appellees and enter a take nothing judgment in favor of ETMC and against Appellees.

II. **APPELLEES FAIL TO REBUT ETMC'S SUPPORTIVE AUTHORITY THAT THERE IS LEGALLY INSUFFICIENT EVIDENCE OF THE APPLICABLE STANDARD OF CARE AND BREACH BY ETMC:**

In its Brief on the Merits, ETMC cited case law that specifically addresses and shows the defects in and legal insufficiency of Appellees' trial evidence on the standard of care applicable to ETMC and a breach of that standard of care by ETMC (Appellant's Brief on the Merits, pages 39-43). Appellees do not cite or reference these cases even once in their brief. Appellees also failed to provide this

Court any authority that establishes or supports their claim the evidence presented at trial is legally sufficient evidence of the applicable standard of care and a breach of that standard by ETMC.

The only authority cited by Appellees on this issue are *Durham Transportation Inc. v. Valero,* 897 S.W.2d 404 (Tex. App.—Corpus Christi 1995, writ denied); *Greater Houston Transportation v. Zrubeck,* 850 S.W.2d 579 (Tex. App.—Corpus Christi 1993, writ denied); and *Ching v. Methodist Children's Hospital,* 134 S.W.3d 235 (Tex. App.—Amarillo 2003, pet. denied). Not one of these cases shows that the evidence Appellees produced at trial was sufficient to establish the standard of care applicable to ETMC in training personnel like Ms. Moore and Ms. Spurgers and a breach of this standard of care.

*Durham Transportation, Inc. v. Valero*, involves a claim that Perez, a school bus driver, was not properly trained and supervised. *Durham Transportation,* 897 S.W.2d at 411. Testimony by a former associate of Perez, Briseno, stated how and why Perez was improperly trained to drive a school bus. Specifically, Briseno testified Perez was not given the required hours of classroom instruction, and was not observed driving for the required number of hours before he was allowed to drive children. *Id.* at 411. The evidence also showed that time cards related to driver training were falsified, and that Perez was not certified by the Texas Education Association as a school bus driver. *Id.* at 413.

*Greater Houston Transportation Co. v. Zrubeck*, involved a bus driver's failure to secure a wheelchair rider to his wheelchair with a seat belt. *Zrubeck,* 850 S.W.2d at 581. In *Zrubeck,* there was evidence that the driver's employer "never instructed [the driver] with regard to proper procedures for these passengers." *Id.* at 591. The driver in question also admitted that she and other drivers regularly allowed wheelchair passengers to ride without seatbelts. *Id.* at 592. Finally, the evidence established that the driver in question was not aware of the employer's safety handbook or mandatory seat belt policy until after the incident. *Id.*

At trial in this matter, Appellees did not provide any evidence about Ms. Moore or Ms. Spurgers even remotely similar to the evidence presented in *Durham Transportation* and *Zrubeck*. Appellees provided no evidence that Ms. Moore or Ms. Spurgers were improperly trained because they were not given the required hours of classroom instruction, that they did not demonstrate their clinical competence before ETMC allowed them to work in one of its ambulances, that they were not certified to provide emergency medical services, that they were not instructed on the use of restraints, that they regularly did not use restraints when indicated, or that they were not aware of or given the ETMC policy on the use of restraint before they cared for Ms. Delaune.

In fact, the evidence at trial established just the opposite. It was undisputed at trial that by the time Ms. Moore and Ms. Spurgers cared for Ms. Delaune they had gone through paramedic school, they had been trained and educated on the use of restraints before working with ETMC and while working at ETMC, they were certified paramedics, they had demonstrated their competence through testing to obtain and maintain their certifications and by testing at ETMC, that ETMC had a policy on the use of restraints they were aware of, that ETMC had specifically taught Ms. Moore and Ms. Spurgers on the use of restraint, and that ETMC's educational program for training personnel like Ms. Moore and Ms. Spurgers followed the standardized national training curriculum (*See,* Appellant's Brief on the Merits, pages 10-14). Thus, in no way is the evidence here in any way, shape, or form similar to the evidence presented in *Durham Transportation* and *Zrubeck*. If anything, *Durham Transportation* and *Zrubeck* illustrate and show the deficient nature of Appellees' evidence.

*Ching v. Methodist Children's Hospital,* has nothing whatsoever to do with whether or not the evidence produced at trial by Appellees was legally sufficient to establish either the standard of care applicable to ETMC in training personnel like Ms. Moore and Ms. Spurgers or a breach of that standard of care by ETMC in training personnel like Ms. Moore or Ms. Spurgers. On page 241 of *Ching*, the page cited by Appellees in their brief (Brief of Appellees, pages 30 and 31), the

Amarillo Court of Appeals only mentions the fact that a hospital has a common law duty to periodically monitor and review the competency of its medical staff. *Ching,* 134 S.W.3d at 241. Absent from *Ching* is any information that describes factually what a hospital would be required to do to discharge this duty or what would constitute legally sufficient evidence of the applicable standard of care related to that duty or a breach of that duty.

This brings up a final point on this authority cited by Appellees. Contrary to Appellees' claim in their brief, at no place on page 413 of *Durham Transportation,* pages 591-92 of *Zrubreck*, or page 241 of *Ching* – or elsewhere in these opinions for that matter – does the Corpus Christi Court of Appeals or the Amarillo Court of Appeals hold or state that "[t]he efficacy of a hospital's implementation and enforcement of its policies must be measured by how well it succeeds in preparing its personnel to respond to known hazards, and not by how comprehensive the syllabus appears on paper" (Brief of Appellees, page 31). In fact, nothing even remotely close to this is stated or held by the Corpus Christi Court of Appeals or the Amarillo Court of Appeals in these opinions. This statement in Appellees' brief is nothing more than the argument of counsel. This statement does not represent the binding or persuasive opinion of any court.

For these reasons, Appellees' authority fails to establish or support a claim that the evidence presented at trial was legally sufficient to establish the standard

of care applicable to ETMC, a breach of that standard of care by ETMC, or that Ms. Moore and Ms. Spurgers were not properly trained.

### III. ETMC'S CASE LAW SHOWS APPELLEES' STANDARD OF CARE AND BREACH EVIDENCE IS LEGALLY INSUFFICIENT:

The *Mackey v. U.P. Enterprises, Inc.,* 935 S.W.3d 446 (Tex. App.—Tyler 1996, no pet.); *Patino v. Complete Tire, Inc.,* 158 S.W.3d 655 (Tex. App.—Dallas 2005, pet. denied); and *Allsup's Convenience Stores, Inc. v. Warren,* 934 S.W.2d 433 (Tex. App.—Amarillo 1996, writ denied) opinions cited and discussed in ETMC's Brief on the Merits are pertinent, relevant and on point because they each directly address the specific evidence that a claimant like Appellees must produce to establish a failure to train (Appellant's Brief on the Merits, pages 41-43).

The take-home points from *Mackey, Patino,* and *Allsup's* are (1) Appellees did not controvert ETMC's specific factual evidence showing the sufficiency of its training of Ms. Moore and Ms. Spurgers, (2) Appellees had to provide specific factual evidence of training that ETMC negligently failed to provide, and (3) Appellees had to present specific factual evidence showing the training ETMC should have provided to Ms. Moore and Ms. Spurgers, but did not provide (Appellant's Brief on the Merits, pages 41-43). Copies of the *Mackey, Patino,* and *Allsup's* opinions are attached to this brief (*See,* Appendix A, B and C, respectively). As shown by ETMC in its earlier brief, Appellees' "evidence" on

these issues is legally insufficient primarily because it is conclusory in nature (Appellant's Brief on the Merits, pages 26-39).

*Lermon v. Minyard Food Stores, Inc.,* 2014 Tex. App. LEXIS 12498 (Tex. App.—Dallas)(Nov. 19, 2014)(pet. denied)(mem. op.)(Appendix D) further shows that Appellees did not present legally sufficient evidence of the standard of care applicable to ETMC or a breach of that standard of care.

In *Lermon,* claimant sued Minyard for malicious prosecution. Lermon asserted Minyard was negligent in hiring, retaining, training and supervising an employee, Rodney Lee. *Id.* at *23. Specifically, Lermon claimed Minyard did not adequately train Mr. Lee to perform the duties he was performing when he investigated a theft Lermon was claimed to have committed. *Id.* at *23. A jury verdict was entered in favor of Lermon and against Minyard. An appeal followed.

The Dallas Court of Appeals discussed that to support a claim for negligent training and supervision "a plaintiff must prove that a reasonably prudent employer would have provided training and supervision beyond that which was given…" *Id.* at *25. More specifically, the Dallas Court of Appeals required plaintiff to produce evidence of the specific training an employer exercising ordinary prudence would provide to its employees. *Id.* at *28. Because Lermon failed to present specific evidence of what additional training was available and commonly used, but was not provided, the Dallas Court of Appeals found that Lermon had

**16**

failed to establish a negligent training claim against Minyard and it reversed the jury verdict and trial court judgment in favor of Lerman and against Minyard. *Id.* at *28-29.

As in *Lerman,* the evidence here establishes that Ms. Moore and Ms. Spurgers had pre-existing training and experience on the use of restraint. *See, id.* at *27-28. As in *Lerman,* there is no evidence that prior to the incident that involved Ms. Delaune there was any basis from which a reasonable employer could conclude that Ms. Moore or Ms. Spurgers were unfit or unqualified to perform their job duties. *See, id.* at *29. As in *Lerman,* Appellees failed to present any evidence of additional training available or commonly used by employers like ETMC that was not used in training Ms. Moore and Ms. Spurgers. *See, id.* at *28. As in *Lerman,* Appellees failed to present any evidence that there was some training available to employers like ETMC that was superior to the training ETMC provided. *See, id.* Finally and most important, as in *Lerman*, Appellees presented no evidence about what additional or different training an employer like ETMC should have provided, but failed to provide. *See, id.*

The fact of the matter is that Appellees did not and could not produce evidence of this nature at trial because, as admitted by Appellees' expert Dr. Wayne, ETMC's training program tracked what is required by the national registry for emergency medical services provider certification (3 RR 11-19). For

these reasons, as established and illustrated by *Lerman,* Appellees "failed to produce any evidence a reasonably prudent employer would have provided training … to [Moore and Spurgers] beyond that which [ETMC] provided," and, thus, "failed to show [ETMC] was negligent." *See, id.* at \*29. As such, the Tyler Court of Appeals should reverse the trial court's judgment in favor of Appellees and enter judgment that Appellees take nothing.

## CONCLUSION

Here is where things stand prior to the submission of this matter for determination by the Court – with or without oral argument.

First, Appellees' only claim against ETMC is for its alleged failure to train Ms. Moore and Ms. Spurgers on the use of restraint.

Second, under Texas law, Appellees' failure to train claim is a dependent tort.

Third, in order to prevail on a dependent tort claim, Appellees had to establish that one of ETMC's employees, Ms. Moore or Ms. Spurgers, committed an actionable tort on the occasion in question.

Fourth, the trial court determined as a matter of law that Ms. Moore and Ms. Spurgers did not commit an actionable tort on the occasion in question.

Fifth, at trial Appellees had to produce legally sufficient evidence of the standard of care applicable to ETMC in training employees like Ms. Moore and Ms. Spurgers on the use of restraint and a breach of that standard of care by ETMC.

Sixth, Appellees' evidence does not state what specific training a reasonably prudent emergency medical services provider like ETMC should provide to employees like Ms. Moore or Ms. Spurgers.

Seventh, Appellees' evidence does not state what specific training a reasonably prudent emergency medical services provider like ETMC should provide to employees like Ms. Moore or Ms. Spurgers, but was not provided to Ms. Moore and Ms. Spurgers by ETMC.

For these reasons, Appellees' evidence of the applicable standard of care, breach of that standard of care and proximate cause on their claim against ETMC is legally insufficient. Because Appellees' evidence against ETMC is legally insufficient in these respects, the Tyler Court of Appeals should reverse the trial court's Final Judgment in favor of Appellees and against ETMC, and enter a take nothing judgment in favor of ETMC and against Appellees.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services, respectfully requests that the Twelfth Court of Appeals grant it the following relief:

1. Reverse the verdict and Final Judgment against it in the trial court, and;

2. Enter a take nothing judgment against Appellees and in favor of East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services.

Respectfully Submitted,

THIEBAUD REMINGTON THORNTON BAILEY LLP

By: /s/Russell G. Thornton
**RUSSELL G. THORNTON**
State Bar Card No. 19982850
rthornton@trtblaw.com

4849 Greenville Avenue, Suite 1150
Dallas, Texas  75206
(214) 954-2200
(214) 754-0999 (Fax)

**COUNSEL FOR APPELLANT**
**EAST TEXAS MEDICAL CENTER d/b/a**
**EAST TEXAS MEDICAL CENTER**
**EMERGENCY MEDICAL SERVICES**

21

# CERTIFICATE OF COMPLIANCE

Pursuant to TEXAS RULES OF APPELLATE PROCEDURE 9.4(i)(3) Appellant certifies that its Reply Brief on the Merits, filed on July 23, 2015 in the Twelfth Court of Appeals, contains **4,040** words.

/s/ Russell G. Thornton
**RUSSELL G. THORNTON**

22

## CERTIFICATE OF SERVICE

The undersigned certifies that on the **23rd** day of **July, 2015**, a true and correct copy of the foregoing document was delivered to counsel listed below:

Mr. Ryan Krebs, M.D., J.D.                                    **VIA E-SERVE & E-MAIL**
THE LAW OFFICE OF RYAN KREBS
805 W. 10th Street, Suite 300
Austin, Texas  78701
ryan@ryankrebsmdjd.com

/s/Russell G. Thornton
**RUSSELL G. THORNTON**

# APPENDIX

# APPENDIX – "A"



**GLENDA MACKEY, APPELLANT v. U.P. ENTERPRISES, INC., D/B/A TACO BELL, APPELLEE**

**NO. 12-94-00011-CV**

**COURT OF APPEALS OF TEXAS, TWELFTH DISTRICT, TYLER**

*935 S.W.2d 446*; *1996 Tex. App. LEXIS 4878*

**October 30, 1996, delivered**
**October 30, 1996, Filed**

**SUBSEQUENT HISTORY:** [**1] Released for Publication January 17, 1997.

**PRIOR HISTORY:** APPEAL FROM THE 241ST JUDICIAL DISTRICT COURT. SMITH COUNTY, TEXAS. Clayton, Hon. Joe, Judge.

**DISPOSITION:** Affirmed in part, reversed in part, and remanded.

**COUNSEL:** WHITEHURST, BOB, TYLER, TX, for appellant.

BUFE, JOHN F., EVANS, DEBORAH O., TYLER, TX, for appellee.

**JUDGES:** Chief Justice Tom B. Ramey, Jr., Justice Charles R. Holcomb, Justice A. Roby Hadden (AUTHOR)

**OPINION BY:** ROBY HADDEN

**OPINION**

[*449] This is an appeal of a summary judgment granted in favor of U.P. Enterprises, Inc., d/b/a Taco Bell ("UPE"). Glenda Mackey ("Mackey") sued her employer, UPE, two of its managers, Ron Smith and Greg Johnson ("Smith" and "Johnson"), and Taco Bell Corporation ("TBC"), the franchisor, alleging eight separate causes of action. Mackey's underlying allegations were that she was sexually harassed by Smith and Johnson. The trial court granted UPE's motion for summary judgment on all causes of action and severed Mackey's causes of action against UPE from the remainder of the case.

Mackey appeals the decision of the trial court, raising ten points of error. We will affirm in part and reverse and remand in part.

UPE's motion for summary [**2] judgment was supported by the affidavit and deposition of Richard Upshaw ("Upshaw"), vice-president and Director of Operations of UPE, the deposition of Mackey, and the depositions of two other employees, Roxie Hall ("Hall") and Jessica Jones ("Jones"). From this evidence, it appears that UPE, a franchisee of TBC, owns and operates several Taco Bell restaurants in Tyler, Smith County, Texas. In November 1990, UPE employed Mackey as an hourly wage employee in one of its restaurants where she was under the supervision of Smith. She was later transferred to a second restaurant where she was under the supervision of Johnson. Mackey was terminated in August 1991. UPE denies that any sexual harassment towards Mackey took place, but that if it did, it was totally unauthorized, unexpected, and unforeseen by UPE. Furthermore, UPE claims that Mackey's injuries, if any, were sustained in the course of her employment and were, therefore, barred by the exclusive remedy provisions of the Texas Worker's Compensation Act ("the Act"). [1] UPE's summary judgment proof also shows that during her employment with UPE, Mackey received several written reprimands for failure to report to work as scheduled [**3] and for rudeness to customers. UPE claims that it was for these reasons that her employment was terminated.

1  Act of December 13, 1989, 71st Leg., 2nd C.S., Ch. 1, § 4.01, 1989 Tex. Sess. Law Serv. 32, *repealed by* Act of May 22, 1993, 73rd Leg., Ch. 269, § 5(2), 1993 Tex. Sess. Law Serv. 1275 (current version at *TEX. LABOR CODE ANN. § 408.001* (Vernon Supp. 1996)).

Mackey's summary judgment proof shows that she was sexually harassed by Smith and Johnson while they were employed by UPE, and that she was allegedly terminated from her employment because she would not give in to their sexual demands. Mackey claims that the Texas Worker's Compensation Act was not applicable to her because the sexual assaults by Smith and Johnson were personal to her and that her injuries were not received in the course of her employment. [2] The summary judgment proof includes the following affidavit by Mackey:

. . .

Greg Johnson and Ron Smith made their work policies clear to me, after approximately one month of [**4] employment. First, Ron Smith, and then, later, Greg Johnson asked me to have sexual intercourse and perform sexual favors for them. Frequently, Ron Smith and Greg Johnson used slang terms such as "let me touch you up". When I refused them, my scheduled hours were systematically reduced. Their [*450] requests for sexual favors happened with regularity. At one point I was informed by Ron Smith that, "if I did it, I'd get more hours."

[2]  UPE was a subscriber under the Texas Worker's Compensation Act during Mackey's employment. However, Mackey did not file a claim nor seek benefits under the Act.

I felt pressured to give in to their demands for sexual favors in order to keep working at Taco Bell. At the time of my employment, I did not have a reliable form of transportation. One afternoon around mid-February of 1991, when I was working at the Gentry store, Ron Smith offered to give I (sic) a ride home if I would pay him $ 2.00. I thanked him and explained that I would pay Ron Smith once I got home because my [**5] money was at home. I got into the car and Ron Smith started for my home across town. After a few minutes Ron Smith said that he did not want the money but instead wanted sex. I said no, that I would rather pay. For the next several minutes Ron Smith and I argued about the method of payment. I would not give in. Furious, Ron Smith pulled over to the side of a very busy road and ordered me from the car. Ron Smith then told me that if I would not have sex with him, I could walk. Although it was several miles, I walked home.

After that incident Ron Smith would brush up against me "accidentally". Ron Smith also started calling me such names as "fat droopy titty", "sticky", "slouchy", and "sorry" in front of other workers at TACO BELL.

Near the first of March 1993, Ron Smith touched my breast and asked me if I was sure I wanted to be transferred to another store. My response was yes".

My transfer to TACO BELL store on Troop (sic) Highway was intended as a punishment or the result of a bet between Ron Smith and Greg Johnson, that is that Greg bet Ron that he could have sexual intercourse with me. Once at the Troop (sic) store, the harassment continued with even more frequency.

In April [**6] of 1991, I caught Greg Johnson and employee Jessica Jones engaging in oral sex. I was then called into the office by Greg Johnson and he told me not to tell anyone or he would "fire my ass if talked". From April of 1991 to August of 1991, the following incidences occurred [sic]:

(1) Greg Johnson would remark to me that he wanted to "touch it up"

(2) Greg Johnson would "accidentally" brush up against me touching my breasts and buttocks.

(3) Greg Johnson called me "shithead", "stupid ass", and "fat ass" in front of some of the workers of Taco Bell.

At one point Greg Johnson arranged for me to be alone with him in the store. At this time Greg Johnson demanded sex. When I denied Greg Johnson, I received a written reprimand. It was obvious the more I denied Greg Johnson, the more I

was penalized. In addition to the above, Greg Johnson would belittle me in front of coworkers and customers by criticizing my work and by calling me names.

Regardless if a female worker complied or not Greg Johnson would verbally and physically harass all the females at work. Greg Johnson would ask personal questions about my home life and my sex life. Greg Johnson would come up to me [**7] and touch me on the breasts or fondle my buttocks. Greg Johnson would ask me what I thought of other women's physical attributes. I had all of these incidents happen to me from April of 1991 to August of 1991.

In July/August of 1991 I made arrangements for Greg Johnson to pick me up at home for a ride to work, because I had no adequate means of transportation. Payment was never discussed and I believed that Defendant had given other employees rides before. When Greg Johnson, in this TACO BELL uniform, came to my door I let him in. I was dressed in my TACO BELL uniform and ready to go to work. Greg Johnson informed me that we were going to have sex. I told him no. His response was "that if I did not have sex with him, he would not take me to work." Greg Johnson also said that if I was late for work he would fire me. I looked at the clock and there was only 15 minutes until I was required to be at work. There was not enough time for me to walk or even call a cab. I felt I had to comply, or I [*451] would lose my job. If I lost my job I couldn't take care of my kids. I believed that I did not have a choice and that Greg Johnson knew that. I felt like I was raped. When I arrived [**8] at work I was emotionally upset and crying.

Around the end of August of 1991, I spoke to another ("TACO BELL") manager on the phone, by the name of Jessica Jones. Jessica Jones had "worked" her way up through the store to become a manager.

During this conversation, I proceeded to tell Jessica Jones that Greg Johnson, a married man, had caused a female employee to become pregnant. I also told Jessica Jones of the stressful working situation and the constant sexual demands. I also informed Roxie Hall (manager) of what happened, who laughed and said she would do something about it. At the next store meeting, Greg Johnson informed the employees, that whatever happened in his store was to remain there or else. Greg Johnson was staring directly at me, when this was said. I was fired later that day.

I unsuccessfully attempted to commit suicide three times since this incidence. I have been forced to go on welfare, to take care of my children, when I didn't believe in welfare before this.

The sexual harassment and assault as stated above did not have any connection to my employment in serving food, taking money for food, cleaning up the store, or other duties that I was assigned. I am [**9] not now, nor have never claimed in any proceeding that I had been injured in the course of my employment or that the sexual harassment and assault arose out of or originated in my employment. I have never filed a claim for Workers' Compensation benefits with the Texas Industrial Accident Board. The behavior of these two managers as described above was personal toward me, and not related to my job as set out above.

In her suit against UPE, Mackey alleged eight separate causes of action as follows:

1. Assault;

2. Intentional infliction of emotional distress;

3. Negligent infliction of emotional distress;

4. Sexual harassment;

5. Tortious interference with contract;

6. Wrongful discharge;

7. Slander; and

8. Negligent supervision, training, and evaluation of Smith and Johnson.

The trial court granted a global summary judgment, and, therefore, summary judgment was granted against Mackey on all eight of her causes of action. Furthermore, since the trial court did not specify the grounds upon which it granted summary judgment on each of Mackey's

causes of action, it was Mackey's burden to show that each independent argument alleged by UPE in its motion for summary judgment [**10] was insufficient to support the trial court's order. Summary judgment will be affirmed if any of the theories advanced by UPE are meritorious. *Insurance Co. of N. Am. v. Security Ins. Co., 790 S.W.2d 407, 410* (Tex. App. - Houston [1st Dist.] 1990, no writ).

In points of error two through eight Mackey alleges that the trial court erred in granting summary judgment in her causes of action based on assault, intentional infliction of emotional distress, sexual harassment, tortious interference with contract, wrongful discharge, and negligent supervision, training and evaluation. On appeal, Mackey has abandoned her cause of action for negligent infliction of emotional distress for the obvious reason that the Texas Supreme Court has held in *Boyles v. Kerr, 855 S.W.2d 593 (Tex. 1993)* that there is no general duty in Texas not to negligently inflict emotional distress. In addition, Mackey has abandoned slander as a separate cause of action; however, we will consider the alleged slanderous comments insofar as they are material to the other causes of action on appeal.

The function of summary judgment is to "eliminate patently unmeritorious claims and untenable defenses. " [**11] *Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952)*; *Mayhew v. Town of Sunnyvale, 774 S.W.2d 284, 286* (Tex. App. - Dallas 1989, writ denied), *cert. denied, 498 U.S. 1087,* [*452] *112 L. Ed. 2d 1049, 111 S. Ct. 963 (1991)*. The purpose of allowing summary judgment is to "provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of fact." *Mayhew, 774 S.W.2d at 287.*

The standard for appellate review of a summary judgment in favor of a defendant is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp., 450 S.W.2d 827, 828 (Tex. 1970).* The movant has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985).* Evidence favorable to the nonmovant will be taken as true in deciding whether there is a disputed material fact issue. *Id.* Every reasonable inference must be indulged [**12] in favor of the nonmovant and any doubts resolved in its favor. *Montgomery v. Kennedy, 669 S.W.2d 309, 310-11 (Tex. 1984).* In addressing the trial court's summary judgment action on each of Mackey's six remaining causes of action brought here on appeal, we will view the summary judgment evidence in light of these admonitions.

## APPLICABILITY OF THE TEXAS WORKER'S COMPENSATION ACT TO CLAIMS FOR ASSAULT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

As one of its grounds for summary judgment, UPE claims that Mackey's injuries from assault and intentional infliction of emotional distress committed by Smith and Johnson were sustained in the course of her employment and were therefore barred by the exclusive remedy provisions of the Texas Worker's Compensation Act. However, Mackey claims that the conduct of Smith and Johnson were personal toward her, not related to her job of serving food, taking money for food, cleaning up the store, or other duties that she was assigned. Therefore, Mackey argues that she was not injured in the scope and course of *her* employment with UPE, all as set out in her summary judgment affidavit. Mackey asserts that her common law claims for assault [**13] and intentional infliction of emotional distress are not barred by the Act because her injuries fall within an exception to coverage, which reads as follows:

An insurance carrier is not liable for compensation if:

. . .

(4) The injury arose out of an act of a third person intended to injure the employee because of personal reasons and not directed at the employee as an employee or because of the employment.

Act of December 13, 1989, 71st Leg., 2nd C.S., Ch. 1, § 3.02, 1989 Tex. Sess. Law Serv. 14, *repealed by* Act of May 22, 1993, 73rd Leg., Ch. 269, § 5(2), 1993 Tex. Sess. Law Serv. 1275 (current version at *TEX. LABOR CODE ANN. § 406.032(1)(c)* (Vernon Supp. 1996)).

Two incidents of sexual harassment took place away from work. However, Mackey was at work when the alleged acts of "touching," "brushing up," fondling her breasts and buttocks, and other demeaning acts took place. Although one's employment may be the occasion for the wrongful act or may give a convenient opportunity for execution, an injury does not arise out of one's employment if the assault is not connected with the employment, or is for reasons personal to the victim as well [**14] as the assailant. *Highlands Underwriters Ins. Co. v. McGrath, 485 S.W.2d 593, 595 (Tex. 1972).* The mere fact that the injury is caused by a co-employee is not controlling of the question of whether the injury is compensable under the Texas Worker's Compensation Act. *Shutters v. Domino Pizza, 795 S.W.2d 800* (Tex.

App. - Tyler 1990, no writ). Whether Mackey's injuries were sustained in the course of her employment is ordinarily a question of fact. *Shutters, 795 S.W.2d at 802.*

From the summary judgment evidence, we conclude that a material issue of fact exists as to whether Mackey's injuries for assault and intentional infliction of emotional distress were sustained in the course of her employment. However, it is not necessary to remand [*453] this case for a determination of that issue. If it were found that Mackey's injuries were sustained in the course of her employment, as defined by the Act, then her recovery under these two causes of action would be barred by the exclusivity of the Act. If Mackey's injuries were not sustained in the course of her employment and fall within the exception above-described, then Mackey would be free to assert her common law remedies [**15] for assault and intentional infliction of emotional distress. However, in the trial court and on appeal, UPE claims that even if Mackey's causes of action for assault and intentional infliction of emotional distress were not barred by the exclusivity of the Act, it was entitled to summary judgment in these two causes of action on Mackey's common law claims as well. For the following reasons, we agree.

### ASSAULT

Mackey claims that the assaultive acts of Smith and Johnson directed towards her were within the course and scope of their employment with UPE, and were thus imputable to UPE. UPE takes the position that the job duties of Smith and Johnson did not include any of the acts directed toward Mackey, and that if they committed the alleged acts of which Mackey complains, they were not acting within the course and scope of their employment. Therefore, UPE argues, such acts of intentional conduct cannot be imputed to UPE.

A longstanding Supreme Court case has been often cited for the proposition that it is not ordinarily within the scope of a servant's authority to commit an assault upon a third person. *Texas & Pac. Ry. Co. v. Hagenloh, 151 Tex. 191, 247 S.W.2d 236 (1952).* Assault [**16] is considered as an expression of personal animosity and not for the purpose of carrying out a master's business. *Tierra Drilling Corp. v. Detmar, 666 S.W.2d 661* (Tex. App. - Corpus Christi 1984, no writ) (citing *Texas & Pac. Ry. Co. v. Hagenloh).* In order to impose liability upon an employer for the tort of its employee under the doctrine of *respondeat superior,* the act of the employee must fall within the scope of the general authority of the employee and must be in furtherance of the employer's business for the accomplishment of the object for which the employee was hired. *Dieter v. Baker Serv. Tools, 739 S.W.2d 405* (Tex. App. - Corpus Christi 1987, writ denied). In *Valdez v. Church's Fried Chicken, Inc., 683*

*F. Supp. 596 (W.D. Tex. 1988),* the plaintiff alleged and the court found that she was assaulted and sexually harassed by a "team leader" of Church's Fried Chicken. However, the court found no liability upon the employer because the team leader was not authorized to use force, and because the sexual assault on the employee was purely personal.

Furthermore, when the servant turns aside, for however a short time, from the prosecution of the master's work [**17] to engage in an affair wholly his own, he ceases to act for the master, and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone. *Dieter, 739 S.W.2d at 407; Tierra Drilling Corp., 666 S.W.2d at 663* (quoting *Galveston, Houston, and San Antonio R.R. v. Currie, 100 Tex. 136, 96 S.W. 1073 (1906)). See also, Gibraltar Savings Assoc. v. Turnbough, 610 S.W.2d 515* (Tex. Civ. App. - Houston [1st Dist.] 1980, writ dism'd); *Calhoun v. Hill, 607 S.W.2d 951* (Tex. Civ. App. - Eastland 1980, no writ).

In *Kendall v. Whataburger, Inc., 759 S.W.2d 751* (Tex. App. - Houston [1st Dist.] 1988, no writ), a food service employee struck a customer with a french-fry basket. There, the court found, as a matter of law, that the assault could not have been so connected with and immediately arising out of the employee's job of taking food orders and preparing and delivering food orders to customers so that his authorized employment tasks and the assault could have merged into one indivisible tort imputable to the master. *Id. at 755.* If the assault by an employee can be traced to a remote cause unrelated to the business of the [**18] employer, the employer cannot be held liable. *See Viking v. Circle K Convenience Stores, 742 S.W.2d 732, 734* (Tex. App. - Houston [1st Dist.] 1987, writ denied) (assault was not in course and scope of employment for an employee to leave the store unattended and follow victim into public street to shoot him over personal reasons); [*454] *Green v. Jackson, 674 S.W.2d 395, 399* (Tex. App. - Amarillo 1984, writ ref'd n.r.e.) (not in course and scope when employee fought with customer over a long-simmering and rancorous personal animosity arising out of personal debt); *Tierra Drilling Corp., 666 S.W.2d at 662* (not in course and scope of employment for supervisor to assault employee over supervisor's dislike of Texans).

Mackey cites the case of *Frito-Lay, Inc. v. Ramos, 770 S.W.2d 887* (Tex. App. - El Paso 1989), *rev'd on other grounds, 784 S.W.2d 667 (Tex. 1990)* in support of her argument that under the summary judgment facts of this case Smith and Johnson were acting in the course of their employment with UPE. In *Frito-Lay,* a snack company employee shoved his company's customer while attempting to take the company's merchandise rack from the store after [**19] the customer informed the em-

ployee that he no longer wanted to carry the company's snack products. There, the court reasoned that a fact-finder could find that the employee was acting within the scope of his employment when he assaulted the customer while trying to retrieve company property. In a similar case, *Durand v. Moore, 879 S.W.2d 196* (Tex. App. - Houston [14th Dist.] 1994, no writ), a doorkeeper of a night club, in his overzealous enforcement of the club's criteria for admittance, assaulted two customers who were waiting for admission. There, the court held that the doorkeeper was acting in the course of his employment in enforcing his employer's rules for admission.

The instant case is not like *Frito-Lay, Inc.* or *Durand,* but is analogous to *Kelly v. Stone, 898 S.W.2d 924* (Tex. App. - Eastland 1995, writ denied). In *Kelly,* a senior billing clerk sued her office manager for sexual harassment, which included sexual advances such as rubbing her on the bottom. There, the court reasoned that the office manager's duties did not include the use or threat of physical force or physical conduct against employees, nor was he ever directed by a company officer [**20] to assault the billing clerk. The conduct of the office manager was simply not work-related. The court there stated that the office manager was clearly motivated by his personal obsession towards the billing clerk, and that his conduct was a pursuit of his own personal gratification. *Kelly, 898 S.W.2d at 929.*

In the instant case, there was no relationship between the assaultive acts of Smith and Johnson and their duties as managers of a food service restaurant. The summary judgment evidence shows that Smith and Johnson would "brush up" against Mackey, would touch her breasts, and fondle her buttocks. None of these alleged assaultive acts were directed by UPE officials. Furthermore, the summary judgment evidence shows that none of these acts were within the scope of Smith and Johnson's general authority as employees of UPE. Each was employed to manage a restaurant, which would include taking food orders, preparing the food, and delivering it to customers. There is simply no connection between these duties and the alleged sexual assaults directed towards Mackey. We, therefore, conclude that the alleged sexual assaults were solely the acts of Smith and Johnson, and that they were [**21] not acting within the scope of their general authority conferred by UPE at that time. There is no genuine issue of fact in that regard, and the trial court did not err in granting summary judgment on Mackey's cause of action for assault.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Mackey also asserts that UPE is liable for intentional infliction of emotional distress arising from the alleged incidents. In *Twyman v. Twyman, 855 S.W.2d 619 (Tex. 1993)*, the Texas Supreme Court recognized the tort of intentional infliction of emotional distress as set forth in *Section 46(1) of the Restatement (Second) of Torts* (1965). The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Tidelands Automobile Club v. Walters, 699 S.W.2d 939, 942-44* (Tex. App. - Beaumont 1985, writ ref'd n.r.e.). From the summary judgment proof outlined above, it is clear [*455] that UPE did not authorize or direct any of the alleged acts of sexual harassment [**22] committed by Smith and Johnson against Mackey. Furthermore, when Smith and Johnson were hired, UPE explained its written policies against sexual harassment, notices of which were posted at each work place. The notices included instructions to report violations of this policy to UPE officials. Mackey did not respond with any summary judgment evidence showing that UPE intentionally or recklessly committed these acts which allegedly caused Mackey emotional distress. Thus, the first prong of the cause of action for intentional infliction of emotional distress has not been met. The trial court did not err in granting summary judgment on Mackey's claim for intentional infliction of emotional distress.

Points of error one, two, three and four are overruled.

## SEXUAL HARASSMENT

Next, Mackey charges UPE with sexual harassment resulting in a hostile work environment and an economic harm to her. She claims that such activity constitutes a violation of *Article 5221k of the Texas Revised Civil Statutes*, commonly known as the Texas Commission on Human Rights Act ("Texas Human Rights Act"). The pertinent provisions are as follows:

> Sec. 5.01. It is unlawful employment practice for an employer:

> (1) [**23] to fail or refuse to hire or to discharge an individual or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, handicap, religion, sex, national origin, or age; or

> (2) to limit, segregate, or classify an employee or applicant for employment in a way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect

the status of an employee because of race, color, handicap, religion, sex, national origin, or age.

TEX. REV. CIV. STAT. ANN. art. 5221k § 5.01(1)(2) (Vernon 1987). [3]

> 3    Repealed by Act of May 22, 73rd Leg., R.S., Ch. 269, Sec. 5(1), 1993 Tex. Sess. Law Serv. 1275 (current version at *TEX. LABOR CODE ANN. § 21.051* (Vernon 1996)).

UPE responded that an employer can be held liable for sexual harassment only if the employer knew or should have known of the harassment in question and failed to take prompt, remedial action. UPE contends that [**24] the summary judgment evidence established the following: (1) that the wrongful conduct of Smith and Johnson was against UPE policy, (2) that UPE did not know of the harassment in question, (3) that Mackey never complained to UPE until after her termination, and (4) that Upshaw immediately initiated corrective measures after it was reported to him. Mackey contends that her summary judgment evidence establishes that she complained to UPE, but that it failed to take prompt remedial action. Furthermore, she argues that her summary judgment evidence shows that the harassment was pervasive and severe, that it altered the conditions of her employment with UPE, creating an abusive working environment.

When reviewing a case brought pursuant to the Texas Human Rights Act, we may look not only to the state statute, but also to the analogous federal provisions contained in Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title VII"). *Eckerdt v. Frostex Foods, Inc., 802 S.W.2d 70* (Tex. App. - Austin 1990, no writ) ("The stated purpose of the Texas Act suggested the state legislature intended it to conform to the policies contained in the federal act; therefore, [**25] we may consider how the federal act is implemented under clauses similar to those in issue in the Texas Act"). Because Texas has little case law interpreting and applying the Texas Human Rights Act, the federal court decisions addressing Title VII issues may provide us with guidance as well. *Speer v. Presbyterian Children's Home & Serv. Agency, 824 S.W.2d 589, 593* (Tex. App. - Dallas 1991), *vacated, 847 S.W.2d 227 (Tex. 1993).*

Sexual harassment is a form of employment discrimination prohibited by Title VII. *Meritor Savings Bank v. Vinson, 477 U.S. 57, 91 L. Ed. 2d 49,* [*456] *106 S. Ct. 2399 (1986); Jones v. Flagship Int'l, 793 F.2d 714, 719 (5th Cir. 1986) cert. denied, 479 U.S. 1065, 93 L. Ed. 2d 1001, 107 S. Ct. 952 (1987); Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982).* The application of Title VII discrimination claims to sexual harassment in the work place have been sufficiently outlined in *Flagship, Dundee,* and *Meritor,* and its background will not be again detailed here. Two types of sexual harassment are outlined in these cases: (1) harassment that, while not affecting economic benefits, creates a hostile or offensive [**26] work environment, and (2) harassment that involves the conditioning of concrete employment benefits on sexual favors. However, every instance of sexual harassment does not give rise to a Title VII claim against an employer. The complaining party must allege and prove a number of elements in order to establish his claim. These elements are:

> (1) The employee belongs to a protective group, i.e., a simple stipulation that the employee is a man or a woman;

> (2) *The employee was subject to unwelcome sexual harassment, i.e.,* sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee;

> (3) *The harassment complained of was based upon sex, i.e., that* but for the fact of her sex, the plaintiff would not have been the object of harassment;

> (4) *The harassment complained of affected a "term, condition, or privilege of employment, "i.e.,* the sexual harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. In the type of harassment that involves the conditioning [**27] of concrete employment benefits on sexual favors, i.e., *quid pro quo,* the employee must show that the employer required sexual considerations from the employee in return for job benefits.

> (5) *Respondeat superior, i.e.,* that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Flagship, 793 F.2d at 719-720*; *Henson, 682 F.2d at 903-905.*

In the instant case, elements one and three above are uncontroverted, that is, Mackey belongs to a protected group, *i.e.,* she is a woman, and the harassment com-

plained of was based upon sex. However, as to elements two and four listed above, UPE argues that its summary judgment evidence shows that it investigated the alleged harassment and concluded that it did not occur; however, if it did occur, it was not sufficiently pervasive so as to alter the conditions of Mackey's employment, and it did not create an abusive working environment for her. Mackey's summary judgment evidence indicates that sexual advances, requests for sexual favors, and other verbal and physical conduct of Smith and Johnson of a sexual nature indeed took place. The evidence suggests that these [**28] gestures were unwelcome in the sense that they were unsolicited and unincited, and that it was undesirable and offensive to Mackey. Mackey's supervisors regularly demanded sexual intercourse from her and others, brushed up against her, touched and fondled her breasts and buttocks, called her demeaning names in front of fellow workers. Furthermore, the supervisors sexually harassed other female employees in the work place and even got one pregnant. Mackey's supervisors told her and the other employees not to tell anyone what was going on at work. Such working conditions inevitably created an abusive and intolerable working environment at Mackey's work place.

Furthermore, Mackey's summary judgment evidence shows that her employment benefits were conditioned on sexual favors for her supervisors. Smith and Johnson were managers with authority to hire, fire, and set the number of hours of their workers. When Smith's requests for sexual favors were refused, Smith reduced Mackey's scheduled working hours, resulting in less pay. At one time, Smith told Mackey, "If I did it, I get more hours." Johnson used his authority to force silence on Mackey. She stated that she was "called into the office [**29] by Greg Johnson and he told me not to tell [*457] anyone or he would fire my ass if talked." Johnson had the authority to evaluate employees' work performance and to reprimand them, which authority he used to coerce sexual favors. Mackey stated that when she denied sex to Johnson she would receive a written work-related reprimand. She stated that the more she denied Johnson, the more she was penalized. One day when Johnson gave Mackey a ride to work, he used his authority to hire and fire to force sexual intercourse from Mackey. We conclude from the summary judgment evidence outlined above that a genuine issue of fact exists relative to element number two, that is, whether Mackey was subject to unwelcome sexual harassment. It is further our conclusion that a genuine issue of fact exists in regards to element number four, both as to whether the sexual harassment created a hostile work environment and whether the harassment involved a *quid pro quo* in the work place, affecting Mackey's economic benefits.

We next turn to element number five, *respondeat superior*. UPE contends that even if the sexual harassment took place and was sufficiently pervasive so as to alter Mackey's [**30] employment conditions and create an abusive working environment, the element of *respondeat superior* is not present since UPE did not know nor should it have known of the alleged harassment. UPE contends that it was not informed of the sexual harassment until after Mackey was terminated, at which time it took prompt, remedial action. However, in her deposition, Mackey stated that before she was terminated, she informed UPE supervisor, Hall, about Smith and Johnson's sexual harassment. Hall allegedly laughed and said she would do something about it. However, Hall did nothing about it. Rather, at the next store meeting, Johnson informed all employees *that* whatever happened in his store "was to remain there or else." In her deposition, Hall denies *that* Mackey told her about the sexual harassment. Although the evidence does not show whether Hall was present at that meeting, she stated that she always attended the staff meetings because she supervised and evaluated the managers. At the time Mackey allegedly informed Hall of the sexual harassment, Hall had been with UPE thirteen years and held a supervisory position with UPE. She worked out of the home office as supervisor of [**31] training, with responsibilities over all five Taco Bell restaurants in Tyler and 100-136 employees.

It is true that Mackey must show that the employer, UPE, knew or should have known of the harassment in question and failed to take prompt remedial action. However, an employee can demonstrate that her corporate employer knew of the harassment by showing that she complained to "higher management" of the harassment, *Bundy v. Jackson, 205 U.S. App. D.C. 444, 641 F.2d 934, 943 (D.C. Cir. 1981),* or by showing the pervasiveness of the harassment which gives rise to the inference of knowledge or constructive knowledge by the employer. *Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir. 1981).* Hall, being the supervisor of training in all five stores, appears to have held a position of "higher management" and, according to Mackey's affidavit, Hall not only failed to restrain Smith and Johnson, but failed to bring the matter to the attention of other officers of the corporation.

Furthermore, UPE was generally aware of increased sexual harassment problems in the work place and had recently dealt with a sexual harassment problem in its own company which had involved Johnson. UPE argues [**32] that the summary judgment evidence shows that the conduct complained of was against the policies of UPE, that those policies and procedures for complaints were posted, and that Mackey did not follow those procedures. However, having a policy against discrimination

and a grievance procedure, coupled with Mackey's failure to invoke that procedure, does not insulate UPE from liability. *Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*. While those factors are relevant, they are not dispositive in this summary judgment case. Although Mackey knew she could "inform Mr. Upshaw of such harassment," she was "not aware of the grievance procedures to follow when sexually harassment (sic)." Moreover, a reasonable procedure for lodging complaints would have been [*458] to inform one's supervisor which, in this case, was either Smith or Johnson, the alleged perpetrators. Based upon the above, we conclude that a genuine issue of fact remains regarding the fifth element of Mackey's sexual harassment cause of action, that is, whether or not UPE knew or should have known of the harassment in question and failed to take prompt, remedial action. Accordingly, [**33] Mackey's point of error five is sustained.

## TORTIOUS INTERFERENCE WITH CONTRACT

As further grounds for summary judgment, UPE alleges that Mackey has not stated a cause of action of tortious interference with a contract. Mackey charges that Smith and Johnson interfered with her working environment in order to deprive her of wages and employment benefits under an employment contract and to undermine her prospects for advancement in the future. Mackey attempts to impute such conduct to UPE. However, it appears from the summary judgment evidence that Mackey does not have an oral or written contract with UPE. UPE responds that the cause of action is without merit since there is no contract with which to interfere. Furthermore, UPE argues that, assuming arguendo that UPE and Mackey had entered into an enforceable employment contract, as a matter of law, there can be no interference with the contract by UPE. Tortious interference with a contract occurs when a person intentionally and improperly interferes with the performance of a contract with a third party. We agree. A party cannot tortiously interfere with his own contract. In Texas, employment contracts are protected from tortious interference [**34] by outsiders. *Sterner v. Marathon Oil Co., 767 S.W.2d 686 (Tex. 1989)*. A party to a business relationship cannot tortiously interfere with himself; liability must be founded upon acts of an interfering third party. *Baker v. Welch, 735 S.W.2d 548, 549* (Tex. App. - Houston [1st Dist.] 1987, writ dism'd). We hold that the trial court did not err in granting summary judgment for UPE on Mackey's cause of action for tortious interference with contract. Accordingly, Mackey's point of error six is overruled.

## WRONGFUL DISCHARGE

Mackey also alleged wrongful discharge as a cause of action. The summary judgment evidence presented by UPE shows that Mackey had neither an oral or written employment contract with UPE, and that she was an "at-will" employee. Mackey presented no controverting evidence. Generally, in the absence of a contract to the contrary, an employer in Texas has the authority to discharge an employee with or without cause. The discharge of an employee requires no justification unless the employer's right to discharge an employee is limited by contract. *Reynolds Mfg. Co. v. Mendoza, 644 S.W.2d 536* (Tex. App. - Corpus Christi 1982, no writ). The employment-at-will [**35] doctrine places no duties on an employer regarding an employee's continued employment. *Winters v. Houston Chronicle Pub. Co., 795 S.W.2d 723 (Tex. 1990)*; *Jones v. Legal Copy, 846 S.W.2d 922* (Tex. App. - Houston [1st Dist.] 1993, no writ).

Nevertheless, Mackey alleges that UPE breached its duty of good faith and fair dealing by terminating her employment. However, Texas law does not impose the duty of good faith and fair dealing on the employer in the "at-will" employment context. *Federal Express Corp. v. Dutschmann, 846 S.W.2d 282, 284 (Tex. 1993)*; *Winters, 795 S.W.2d at 724 n. 2*; *Day & Zimmermann, Inc. v. Hatridge, 831 S.W.2d 65* (Tex. App. - Texarkana 1992, writ denied). Mackey's reliance upon such theory is without merit. *Casas v. Wornick Co., 818 S.W.2d 466* (Tex. App. - Corpus Christi 1991), *rev'd on other grounds, 856 S.W.2d 732 (Tex. 1993)*.

However, there are statutory exceptions to the employment-at-will doctrine, such as Section 5.01 of the Texas Human Rights Act. Its provisions make it unlawful for an employer to discharge an employee because of his or her sex. *Dutschmann, 846 S.W.2d at 284*. [4] Mackey therefore has a cause of action [**36] if the sexual harassment conduct [*459] by Smith and Johnson resulted in her discharge. *Flagship, 793 F.2d at 720*.

> 4 For a discussion of the burdens of proof and production in employment discrimination cases, *see Texas Dept. of Human Services v. Hinds, 904 S.W.2d 629, 636 (Tex. 1995)*.

UPE presented summary judgment evidence showing that Mackey had received several reprimands for being rude to customers and for being late to work. On the day of her discharge, Upshaw personally witnessed Mackey being rude to a customer and ordered Johnson to terminate her, which he did. However, the summary judgment evidence also showed that Johnson told Mackey that he would fire her if she talked about the sexual activity at the restaurant. On one occasion, when Johnson was giving Mackey a ride to work, he told her that she was going to have sex with him or he would not take her to work. Johnson told Mackey that if she was late for work, he would fire her. Since there was not

enough time for Mackey to walk or [**37] even call a cab, she complied in order to keep her job. Mackey then complained of the sexual harassment to Jones, a fellow employee, whose response was, "Well, you know Greg." Mackey also complained to Hall, a supervisor. At the next employee meeting, which was on the day Mackey was terminated, Johnson said to the group, "My employees, what goes on in this store, stays in this store. And for all of you that's running your mouth, it's going to stop." Then, as Johnson was looking at Mackey, he stated, "Some of you with your big ass mouth, I'm going to get rid of you." Later that same day, assistant restaurant manager, Daryl Friend, told Mackey that Johnson had called and that she was fired. We conclude that Mackey's summary judgment evidence controverted UPE's version of her termination, and that a genuine factual issue exists as to whether Mackey was terminated in violation of the Texas Human Rights Act. Therefore, based upon the above, we hold that the trial court committed error in granting summary judgment for UPE on Mackey's cause of action for wrongful discharge. Accordingly, Mackey's point of error seven is sustained.

NEGLIGENT SUPERVISION, TRAINING AND EVALUATION

Finally, Mackey [**38] alleges that UPE was negligent in its supervision, training, and evaluation of Smith and Johnson. Specifically, Mackey's claims against UPE include: (1) failing to adequately monitor Smith and Johnson's supervisory practices in their positions of store manager, (2) failing to detect and take action to deter the alleged sexual harassment by Smith and Johnson, and (3) failing to implement and monitor procedures for the handling of employee grievances. UPE responds by asserting that such a negligent claim by Mackey was barred by the exclusive remedy provision of the Texas Worker's Compensation Act. We agree. The Texas Worker's Compensation Act is the exclusive remedy for work-related injuries based upon negligence. *Reed Tool Co. v. Copelin, 689 S.W.2d 404 (Tex. 1985).* Thus, the Act bars Mackey's claims based upon work-related negligence. *Jones, 846 S.W.2d at 925-926.* Again, Mackey alleges that the injuries she received from the conduct of Smith and Johnson were not work-related, and that their conduct was personal toward her. Therefore, she argues, her common law cause of action survives. If Mackey's injuries were sustained in the course of her employment, then her recovery [**39] would be barred by the exclusivity of the Act. If not, then the Act does not disturb Mackey's alleged common law remedies for negligent supervision, training, and evaluation, which we will now address.

Generally, the employer-employee relationship creates a duty on the part of the employer to control the employee's conduct. *See Otis Engineering Corp. v. Clark,*

*668 S.W.2d 307, 309 (Tex. 1983).* An employer has a duty to adequately hire, train, and supervise employees. The negligent performance of those duties may impose liability on an employer if the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from misconduct of its employees. *See Dieter, 739 S.W.2d at 408.* Liability for negligent supervision is not dependent upon a finding that the employee was acting in the course and scope of his employment when the tortious act occurred. *Id.*

UPE's summary judgment evidence shows that it had a written policy statement against sexual harassment and that it was [*460] posted at all of its stores. UPE required all new employees to read the store policy and to sign a statement acknowledging that they had [**40] read it and understood it. UPE stressed to all employees that sexual harassment was strictly against company policy. UPE conducted training sessions with its managers and employees at least twice per month, and at these meetings it was stressed that sexual harassment was strictly against company policy. More specifically, the managers were told what it included, i.e., that it included physical touching, words with sexual connotations, and any sexual conduct which took place among employees or by employees towards customers. The managers were told that they were responsible for controlling such prohibited conduct. UPE established and implemented a grievance procedure which was also posted at each of the restaurants. An officer of the company visited each restaurant daily in order to monitor the activities of the employees. Supervisors from the home office visited each store daily and performed on-site supervision and evaluation of the managers and employees. UPE argues that its conduct in this regard conclusively shows that it acted as a reasonable, prudent employer and was not negligent in supervising, training, and evaluating Smith and Johnson. Mackey's summary judgment evidence does [**41] not controvert these facts. She simply relies upon the allegations of sexual harassment by Smith and Johnson. In order to avoid the adverse ruling of the trial court, it was necessary for Mackey to submit summary judgment evidence controverting these facts or specifying other acts or omissions of UPE showing that it failed to monitor Smith and Johnson's supervisory practices, failed to detect or take action to deter the alleged sexual harassment, or that it failed to implement and monitor procedures for handling grievances. *See Musgrave v. Lopez, 861 S.W.2d 262, 264 (Tex. App. - Corpus Christi 1993, no writ).* Mackey failed to do so. We therefore conclude that there is no genuine issue of fact regarding Mackey's alleged negligent supervision, training, and evaluation. Accordingly, we hold that the trial court did not err in granting summary judgment for UPE on this cause of action. Mackey's point of error eight is overruled.

REMAINING POINTS OF ERROR

Mackey's point of error nine states: "The trial court erred in granting summary judgment for Appellee in its filing of response to Appellant's motion for summary judgment." Mackey's point and her argument under this point are not [**42] clear. *TEX. R. APP. P. 74(f)* requires that the argument in the brief shall include: (1) a fair, condensed statement of the facts pertinent to such points . . .; and (2) such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. Mackey's point of error and argument do not comply with the requirements of *Rule 74(f)*; however, in the interest of justice, we will attempt to address this point.

UPE filed its motion for summary judgment with appropriate summary judgment evidence attached. Mackey then filed a response to the summary judgment motion and attached her summary judgment evidence. Thereafter, UPE filed "Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment" in which UPE presented to the trial court arguments and authorities supporting their summary judgment motion. UPE's response was simply procedural and added no new substantive matters. UPE's argument in its reply was that Mackey had not presented sufficient or competent summary judgment evidence controverting its summary judgment evidence on several of the causes of action alleged by Mackey. Mackey apparently argues that the granting of summary [**43] judgment based on UPE's response and argument would be an illegal shifting of the burden, and would constitute the granting of a default judgment in a summary judgment proceeding.

It is true, as Mackey argues, that summary judgment may not be obtained by default for lack of an answer or response to the summary judgment motion when the movant's evidence is legally insufficient. *Cotton v. Ratholes, Inc., 699 S.W.2d 203 (Tex. 1985)*; *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671 (Tex. 1979)*. However, when movant's summary judgment [*461] evidence is legally sufficient, nonmovant must produce summary judgment evidence controverting the movant's summary judgment proof in order to avoid an adverse summary judgment ruling. *Musgrave, 861 S.W.2d at 264*. In this point of error, Mackey fails to recognize that UPE has presented legally sufficient summary judgment evidence, that it was clear, positive, direct, and free from inconsistencies, and could have been readily controverted by Mackey. Therefore, the evidence supports summary judgment in four of her causes of action as outlined above. Point of error nine is overruled.

In her tenth point of error, Mackey alleges [**44] that the trial court erred in refusing to allow her to file her third amended petition. On January 14, 1993, the trial court signed a scheduling order setting pretrial deadlines pursuant to the court's local rules. The order required all amended pleadings to be filed by November 10, 1993. Mackey did not file her third amended petition until December 3, 1993, which was untimely according to the court's order. *Texas Rule of Civil Procedure 63* provides, in pertinent part:

Parties may amend their pleadings . . . by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under *Rule 166*, shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.

*TEX. R. CIV. P. 63*. *Texas Rule of Civil Procedure 166* expressly provides, in pertinent part:

The court shall make an order which recites the action taken at the pretrial conference, [**45] the amendments allowed to the pleadings, the time within which same may be filed, and the agreements made by the parties as to any of the matters considered . . . and such order when issued shall control the subsequent course of the action, unless modified at the trial to prevent manifest injustice.

*TEX. R. CIV. P. 166*; *see also Forscan Corp. v. Dresser Industries, Inc., 789 S.W.2d 389, 393* (Tex. App. - Houston [14th Dist.] 1990, writ denied).

Mackey argues that her third amended petition was filed well in advance of the seven-day rule provided for in *TEX. R. CIV. P. 63*. However, Mackey does not address the effect of *TEX. R. CIV. P. 166*, which provides that a scheduling order, when issued, shall control the subsequent course of action of the parties. Nevertheless, in the interest of justice, we will address the action of the trial court under the appropriate abuse of discretion standard. *Forscan Corp., 789 S.W.2d at 393*.

In her third amended petition, Mackey added in several places the allegation that TBC was the employer of Mackey, Smith, and Johnson. However, Mackey had already made these allegations in various other para-

graphs in her second amended petition, [**46] and furthermore, the allegations against TBC would not be material in this case against UPE. Also, in her third amended petition, Mackey added allegations that Smith and Johnson were "managers." This allegation had been previously asserted by Mackey in her second amended petition. The only other change made in her third amended petition was the elimination of her claim of negligent infliction of emotional distress. As stated above, such cause of action would be without merit since there is no general duty in Texas not to negligently inflict emotional distress. *Boyles, 855 S.W.2d at 597.*

Based on our review of the record, it appears that Mackey did not attempt to add any new causes of action in her third amended petition or factual allegations necessary to support subsequent proof. Moreover, the record does not show that the trial court refused to consider Mackey's allegations that Smith and Johnson acted as managers.

Furthermore, even if the trial court erred in disallowing the filing of Mackey's third amended petition, the error was harmless. The third amended petition did not add any [*462] significant allegations to her case, nor would allowing the third amended petition [**47] to be filed afford Mackey any greater actual or theoretical basis for overcoming the summary judgment. Therefore, the error, if any, did not amount to such a denial of Mackey's rights that it would reasonably be calculated to cause or probably did cause, the rendition of an improper judgment. TEX. R. APP. P. 81(b)(1). We conclude that the trial court did not abuse its discretion in refusing to allow Mackey to file her third amended petition. Mackey's point of error ten is overruled.

The judgment of the trial court granting summary judgment in Mackey's causes of action based on sexual harassment and Mackey's cause of action based on wrongful discharge is reversed and remanded to the trial court for further proceedings in accordance with this opinion. In all other respects, the judgment of the trial court is affirmed.

ROBY HADDEN

Justice

Opinion delivered October 30, 1996.

Panel consisted of Ramey, Jr., C.J., Holcomb, J., and Hadden, J.

# APPENDIX – "B"



**REYNALDO C. PATINO, Appellant v. COMPLETE TIRE, INC., Appellee**

**No. 05-04-00561-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

*158 S.W.3d 655*; *2005 Tex. App. LEXIS 1841*

**March 10, 2005, Opinion Filed**

**SUBSEQUENT HISTORY:** [**1] Released for Publication April 8, 2005.
Petition for review denied by *Patino v. Complete Tire, Inc., 2005 Tex. LEXIS 454 (Tex., June 10, 2005)*

**PRIOR HISTORY:** On Appeal from the County Court of Law No. 2. Dallas County, Texas. Trial Court Cause No. CC-03-6515-B.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For APPELLANT: Mr. Kent Wade Starr, STARR & ASSOCIATES, Dallas, TX.

For APPELLEE: John Walter Reeder, Plano, TX.

**JUDGES:** Before Justices Bridges, Richter, and Lang. Opinion By Justice Lang.

**OPINION BY:** DOUGLAS S. LANG

**OPINION**

[*658] Opinion By Justice Lang

In two issues, Reynaldo C. Patino challenges the summary judgment and discovery sanctions granted in favor of Complete Tire, Inc. For the reasons below, we resolve Patino's two issues against him and affirm the trial court's summary judgment.

**I. BACKGROUND**

Complete Tire, Inc. hired Patino in May 2002 to remove and repair flat truck tires. According to the allegations in Patino's original petition, on June 10, 2002, while removing a large flat tire from the rim, he was struck in the head by a piece of pipe and was injured. He received medical attention. Complete Tire, Inc. terminated Patino on July 3, 2002. Patino alleged that Complete Tire, Inc., was negligent in failing to provide training and supervision on the proper method and safety hazards of removing and repairing flat tires and that, as a result of these failures, he was injured.

Complete Tire, Inc. served discovery requests upon Patino, to which Patino served objections and responses. [**2] After Patino failed to supplement his answers, Complete Tire, Inc. filed a combined motion to compel and motion for sanctions, asserting that Patino's answers were deficient. Patino responded to the motion to compel and motion for sanctions and supplemented [*659] his discovery responses. After a hearing, the trial court granted the motion to compel. Subsequently, the trial court heard the motion for sanctions and ordered Patino to pay $ 1,500 in attorney's fees to Complete Tire, Inc.

Complete Tire, Inc.'s initial motion for no-evidence summary judgment was denied as premature. Subsequently, Complete Tire, Inc. filed a "reasserted" no-evidence motion for summary judgment. Patino responded and supported his response with evidence. The trial court granted the motion for summary judgment. The prior order on discovery sanctions was specifically made a part of the order granting summary judgment. This appeal timely followed.

**II. PROPRIETY OF SUMMARY JUDGMENT**

In his first issue, Patino contends the trial court erred in granting Complete Tire, Inc.'s no-evidence motion for summary judgment.

**A. Standard of Review and Applicable Law**

When a motion for summary judgment is presented [**3] under *rule of civil procedure 166a(i)* asserting there is no evidence of one or more essential elements of

the nonmovant's claims upon which the nonmovant would have the burden of proof at trial, the burden shifts to the nonmovant to present enough evidence to be entitled to a trial, that is, evidence that raises a genuine fact issue on the challenged elements. *TEX. R. CIV. P. 166a(i)* & cmt.; *S.W. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215, 45 Tex. Sup. Ct. J. 502 (Tex. 2002); Gen. Mills Rests., Inc. v. Tex. Wings, Inc., 12 S.W.3d 827, 832 (Tex. App.-Dallas 2000, no pet.).* If the nonmovant is unable to provide enough evidence, the trial judge must grant the motion. *Gen. Mills Rests., Inc., 12 S.W.3d at 832.*

Because a no-evidence summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Id. at 832-33.* Thus, our task as an appellate court is to determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *Id. at 833.* [**4] We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Id.*

Because it is undisputed that Complete Tire, Inc. is a workers' compensation nonsubscriber, Patino must establish negligence by Complete Tire, Inc. in order to recover. *See Werner v. Colwell, 909 S.W.2d 866, 868, 38 Tex. Sup. Ct. J. 1113 (Tex. 1995); TEX. LAB. CODE ANN. § 406.033(d)* (Vernon 2004-05) (providing that, in action against employer who lacks workers' compensation insurance, "the plaintiff must prove negligence of the employer"). The elements of a negligence cause of action are: (1) the defendant owed a particular duty to the plaintiff; (2) the defendant breached that duty by failing to adhere to a recognized standard of care; and (3) the breach of duty proximately caused the plaintiff injury. *See Van Horn v. Chambers, 970 S.W.2d 542, 544, 41 Tex. Sup. Ct. J. 1168 (Tex. 1998).*

### B. Discussion

Initially, we address Patino's argument in his response and on appeal that Complete Tire, Inc.'s motion for summary judgment was conclusory and did not attack any of the essential [**5] elements of his negligence cause of action. If a no-evidence motion for summary judgment is not [*660] specific in challenging a particular element or is conclusory, the motion is legally insufficient as a matter of law. *Callaghan Ranch, Ltd., v. Killam, 53 S.W.3d 1, 3 (Tex. App.-San Antonio 2000, pet. denied)* (citing *McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 342, 36 Tex. Sup. Ct. J. 792 (Tex. 1993); see Cimarron Hydrocarbons Corp. v. Carpenter, 143 S.W.3d 560, 563 (Tex. App.-Dallas 2004, pet. filed).*

After stating the elements of a negligence cause of action and the no-evidence summary judgment standard, Complete Tire, Inc.'s "Reasserted No-Evidence Motion for Summary Judgment" states:

Therefore, Defendant is entitled to summary judgment because Plaintiff cannot demonstrate any evidence to support his negligence claims. Specifically, Plaintiff cannot prove the existence of a specific legal duty owned to him, the breach of that duty, that any such breach caused him injury, and that his alleged continuing medical problems are causally related to any alleged injury he suffered as a result of Defendant's negligence.

We conclude the motion states the [**6] elements of Patino's negligence claim as to which there is no evidence as required by *rule 166a(i). See TEX. R. CIV. P. 166a(i); cf. Killam, 53 S.W.3d at 3-4* (concluding that motion stating defendants "are entitled to summary judgment because the Plaintiffs cannot by pleading, deposition, answers to interrogatories or other admissible evidence demonstrate there is any evidence to support the declaratory judgment seeking to declare the road in question a public thoroughfare" and generally challenging plaintiff's factual allegations failed to state elements of causes of action as to which there was no evidence and was legally insufficient). Accordingly, we reject Patino's argument that the motion for summary judgment was legally insufficient.

Next, we address Patino's argument that the trial court erred in granting the no-evidence motion for summary judgment because he brought forth more than a scintilla of evidence to prove his negligence claim.

### 1. Standard of Care

An employer has a duty to adequately hire, train, and supervise employees. *Allen v. A & T Transp. Co., 79 S.W.3d 65, 70 (Tex. App.-Texarkana 2002, [**7] pet. denied).* The negligent performance of those duties may impose liability on an employer if the complainant's injuries result from the employer's failure to take reasonable precautions to protect the complainant from the misconduct of its employees. *Id.* Although an employer is not an insurer of its employees' safety at work, it has a duty to use ordinary care in providing a safe workplace. *Id.* This includes providing rules and regulations for the safety of employees, warning employees of the hazards of their employment, and supervising their activities. *Id.* The age and experience of the employee should be considered in measuring the duty of the employer. *Id.*

As an offshoot of this duty, the employer is also required to instruct employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities. *Id.* However, an employer has no duty to adopt safety rules where its business is

neither complex nor hazardous or where the dangers incident to the work are obvious or are of common knowledge and fully understood by the employee. *Id.*

The duty to warn or caution an employee of a danger arises when: (a) the employment [**8] is of a dangerous character requiring skill and caution for its safe and proper discharge, and (b) the employer is aware of the danger and has reason to [*661] know the employee is unaware of the danger. *Id.* However, an employer's duty to instruct applies to an inexperienced employee, but not to one who is experienced in the work he is assigned. *Id.*

In his response, Patino stated that he had "retained an expert with 33 years of experience in the tire industry who will be testifying regarding training necessary to prevent injuries and deaths of individuals charged with changing large diesel tires." Patino did not identify the alleged expert. Patino did not attach to his response an affidavit from any person setting forth the standard of care regarding training and supervision of a person with Patino's experience in tire changing. Patino did not produce any evidence as to his experience or knowledge, Complete Tire, Co.'s knowledge of his experience at the time of the incident, or the specific equipment or procedure for which he lacked training or supervision. Accordingly, we conclude that Patino failed to bring forth any evidence as to the challenged element of standard of care. [**9] *See TEX. R. CIV. P. 166a(i).*

### 2. Breach of Duty

Patino argues that a breach of an employer's duty to provide a safe work place for its employees can be established when evidence is provided that training beyond that given by the employer would be necessary or proper by a reasonably prudent employer. *See Allsup's Convenience Stores, Inc. v. Warren, 934 S.W.2d 433, 437 (Tex. App.-Amarillo 1996, writ denied).* Here, Patino points to the affidavits of two former co-workers, who stated that they never received any type of training. This is no evidence as to the absence of any training as to Patino.

Patino's summary judgment evidence included Complete Tire, Inc.'s interrogatory response, in which it stated that, for the first two days of employment, Patino was sent out on calls with an experienced tire technician and "at that time his tire changing technique would have been observed and any necessary comments made concerning adjustments that may have been necessary in his tire changing technique and examples of proper tire changing techniques would have been shown to him" and that "[a] few times after that initial two day period, [Patino] [**10] accompanied a more experienced tire technician on an assigned job." However, Patino presented no evidence showing that training and supervision beyond that given by Complete Tire, Inc. would be nec-

essary or proper by a reasonably prudent employer, that is, the training and supervision Complete Tire, Inc. negligently failed to provide. *See id.* We conclude that Patino failed to bring forth any evidence showing a breach of any standard of care. *See TEX. R. CIV. P. 166a(i).*

### 3. Causation

Proximate cause comprises two elements: cause in fact and foreseeability. *Excel Corp. v. Apodaca, 81 S.W.3d 817, 820, 45 Tex. Sup. Ct. J. 962 (Tex. 2002).* The test for cause in fact, or "but for cause," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred." *Id.* (quoting *Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477, 38 Tex. Sup. Ct. J. 732 (Tex. 1995)).* Although it appears that Complete Tire, Inc. acknowledges that Patino was injured while using a tire iron, Patino provided no evidence as to what actually happened and how he was injured. Thus, he provided no evidence linking his injuries to anything Complete [**11] Tire, Inc. did or failed to do. *See id. at 822.* Patino argues that he provided the injury reports of two former employees who were injured "in the exact same manner" as he was. But evidence of work-place injury is no evidence that, if [*662] Complete Tire, Inc. "had done something different," Patino would not have been injured or would not have received the specific injuries he claimed. *See id. at 820.* Accordingly, Patino failed to bring forth any evidence as to the element of causation. *See TEX. R. CIV. P. 166a(i).*

Having concluded that Patino failed to bring forth any evidence as to the challenged elements, we resolve his first issue against him.

### III. PROPRIETY OF SANCTIONS

In his second issue, Patino contends the trial court erred in granting Complete Tire, Inc.'s, motion for discovery sanctions.

#### A. Standard of Review and Applicable Law

A trial court's ruling on a motion for sanctions is reviewed under an abuse of discretion standard. *Cire v. Cummings, 134 S.W.3d 835, 838, 47 Tex. Sup. Ct. J. 465 (Tex. 2004).* The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, [**12] but "whether the court acted without reference to any guiding rules and principles." *Id. at 838-39* (citation omitted). The trial court's ruling should be reversed only if it was arbitrary or unreasonable. *Id. at 839.* Sanctions are used to assure compliance with discovery and deter those who might be tempted to abuse discovery in the absence of a deterrent. *Id.* However, a trial court may not impose a sanction that is more severe than necessary

to satisfy its legitimate purpose. *Id.*; *see TransAmerican Natural Gas Corp. v. Powell, 811 S.W.2d 913, 917, 34 Tex. Sup. Ct. J. 701 (Tex. 1991)* (holding that *rule of civil procedure 215* requires that any sanctions imposed be just, meaning that they must relate directly to the abuse found and not be excessive).

Texas Rule of Civil Procedure 215.2 allows a trial court to sanction a party for failure to comply with a discovery order or request. TEX. R. CIV. P. 215.2. Pursuant to rule 215.2(b), a trial court may order the disobedient party to pay reasonable expenses, including attorney's fees, caused by the failure to obey the order. TEX. R. CIV. P. 215.2(b)(8) [**13] .

### B. Discussion

On June 27, 2003, Complete Tire, Inc. sent a request for disclosures, interrogatories, and requests for production to Patino. The parties entered a *Rule 11* agreement allowing Patino until August 13, 2003 to respond to the discovery. On August 8, Complete Tire, Inc. received Patino's responses to discovery. On August 13, Complete Tire, Inc. notified Patino by letter that the discovery responses were "inadequate and incomplete" and required immediate supplementation within ten days. On August 29, when no response was received, Complete Tire, Inc. filed a motion to compel Patino to respond more fully to discovery requests and motion for sanctions.

A hearing on the motion to compel was set for October 10. On October 3, Patino sent amended discovery responses to Complete Tire, Inc. In its order on the motion to compel, the trial court found that Patino's responses were "incomplete and evasive"; the motion to compel was filed after Patino failed to serve supplemental responses within the ten-day deadline; the dis-

covery responses were not amended until October 6, four days before the hearing; and, the amended responses, "while an improvement in some areas," were incomplete [**14] and evasive in other areas. The trial court granted the motion to compel as to many of the responses.

After a hearing on the motion for sanctions, the trial court signed a supplemental [*663] order on the motion to compel discovery and motion for sanctions, in which it "referenced the findings it made in its prior order" on the motion to compel and found that an award of $ 1,500 in attorney's fees associated with compelling responses to discovery was appropriate.

Patino argues that the discovery requests were overly broad and were not limited as to a time period. However, as detailed above, the record shows that Patino asked for and was granted additional time to answer, provided insufficient answers, and developed his answers further only in response to a motion to compel. Even after providing supplemental answers, the trial court found those answers to be "incomplete and evasive." On this record, we conclude the trial court did not abuse its discretion in granting Complete Tire, Inc.'s motion for sanctions. *See Cire, 134 S.W.3d at 838-39*. We resolve Patino's second issue against him.

### IV. CONCLUSION

Having resolved Patino's two issues against him, we affirm the [**15] trial court's summary judgment.

DOUGLAS S. LANG

JUSTICE

# APPENDIX – "C"



**ALLSUP'S CONVENIENCE STORES, INC., APPELLANT v. JACKIE WARREN, APPELLEE**

**NO. 07-96-0122-CV**

**COURT OF APPEALS OF TEXAS, SEVENTH DISTRICT, AMARILLO**

**934 S.W.2d 433; 1996 Tex. App. LEXIS 5160**

**November 21, 1996, Decided**

**SUBSEQUENT HISTORY:** [**1] Appellee's Motion for Rehearing Overruled December 20, 1996.

**PRIOR HISTORY:** FROM THE 222ND JUDICIAL DISTRICT COURT OF DEAF SMITH COUNTY; NO. CI-94F-102; HONORABLE DAVID WESLEY GULLEY, JUDGE.

**DISPOSITION:** Reversed and rendered

**COUNSEL:** Ed McConnell, David Duncan, SMITH STORRS WILSON & MCCONNELL PC, Amarillo, Texas.

Jeffrey B. Jones, Bradley M. Pettiet, John D. Rosentreter, JONES FLYGARE GALEY BROWN & WHARTON, Lubbock, Texas.

**JUDGES:** PANEL E, Before BOYD, C.J., REAVIS, J. and REYNOLDS, S.J. * Opinion by Senior Justice Reynolds.

    \* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1996).

**OPINION BY:** Charles L. Reynolds

**OPINION**

[*434] Allsup's Convenience Stores, Inc. (Allsup) challenges the judgment rendered against it on Jackie Warren's negligence cause of action for personal injuries, contending there was no evidence concerning (1) negligence, (2) proximate cause, and (3) causal connection. Agreeing there was a lack of evidence of negligence, we will reverse and render.

Warren, employed by Allsup as a store manager in Hereford, filed her action against Allsup and Affiliated Foods, [**2] Inc., alleging their negligence was the proximate cause of injuries she received on 8 June 1992 and 13 July 1992 while lifting cardboard boxes, each containing six one gallon jugs of milk, out of an Affiliated Foods delivery truck while in the scope of her employment with Allsup. Because Allsup was not a subscriber under Texas Workers' Compensation laws, she grounded her action on *Texas Labor Code section 406.033(d)*, [1] and alleged Allsup's violation of *Texas Revised Civil Statute article* [*435] *5182a* to show the requisite negligence. [2] *Sears Roebuck & Company v. Robinson, 154 Tex. 336, 280 S.W.2d 238, 239 (1955).*

    1 The Labor Code provides that in an action against an employer for an injury received in the course and scope of employment, where the employer does not have workers' compensation insurance coverage, "plaintiff must prove negligence of the employer or of an agent or servant of the employer acting within the general scope of the agent's or servant's employment." *Tex. Labor Code Ann. § 406.033(d)* (Vernon Pamph. 1997).

    2 *Texas Revised Civil Statute article 5182a* was repealed after Warren filed suit on 3 June 1994. Acts 1995, 74th Leg., ch. 76, § 954(c), eff. Sept. 1, 1995. However, prior to its repeal, section 3 provided that "Every employer shall furnish and maintain employment and a place of employment which shall be reasonably safe and healthful for employees. Every employer shall install, maintain, and use such methods, process, devices, and safeguards, . . . as are reasonably necessary to

protect the life, health, and safety of such employees, and shall do every other thing reasonably necessary to render safe such employment and place of employment." *Id.*

[**3] Specifically, Warren alleged that Allsup was negligent in its:

> 1. Failure to provide a safe place of employment as required by Tex. Rev. Civ. Stat. Ann. art. 5182a, section 3;

> 2. Failure to provide Plaintiff with assistance in unloading supplies from the rear of a tractor bed from a height of chest level or above;

> 3. Failure to adequately or properly train the employees in any manner in lifting heavy or awkward items from the rear of a tractor trailer bed from a height of chest level or above;

> 4. Failure to provide adequate equipment to lift items from the rear of a tractor trailer bed from a height of chest level or above;

> 5. Failure to provide safety equipment to lift items from the rear of a tractor trailer bed from a height of chest level or above;

> 6. Failure to adhere to safety requirement under the Occupational Safety and Health Act, by failing to provide safety equipment in order to unload by lifting items from the rear of a tractor trailer bed from a height of chest level or above; and

> 7. Failure to provide assistance in the operation of the convenience store while unloading the Affiliated [**4] Foods, Inc. tractor trailer.

Allsup generally denied Warren's action and affirmatively asserted its right to offsets for payment of medical expenses and wages. Additionally, Allsup specially excepted to Warren's interpretation of and reliance upon article 5182a, *supra*, but no action on the special exception is recorded.

The record reveals that in April of 1992, Warren was hired by Dale McDonald, a supervisor for Allsup, as an assistant manager of Allsup's Store No. 111. Later, she became manager of the store after McDonald had fired all the other employees at the store. Although the store manager normally hires and fires the employees, and schedules their work hours, McDonald hired the employees for this store. Subsequently, on 4 July 1992, Warren was transferred as manager to Store No. 112, where the employees previously had been hired. The manager was responsible for, among other things, unloading the merchandise delivered to the store by trucks of Affiliated Foods, Allsup's supplier, and to see that the trucks were not delayed in any way. McDonald told Warren that she needed to schedule one of the men to unload the truck every time, the advice given each female store [**5] manager.

Among other testimony, the jury heard Warren's description of the events surrounding the two incidents. At Store No. 111, she had scheduled a young boy to work on June 8, the day of the delivery, but he failed to show. She telephoned McDonald for help, but none arrived. Because the Affiliated Foods driver would not wait for her to get help, Warren unloaded the truck alone by carrying the boxes off the tailgate of the delivery truck and setting them down inside the store, hurting her back in the process. [3] Her depiction of the events at Store No. 112 on July 13 was substantially the same.

> 3   There was no testimony concerning how many boxes Warren actually carried off the delivery truck.

Ten members of the twelve person jury found that both Allsup and Warren were negligent, but Affiliated was not. [4] They attributed 25% of the negligence to Allsup and 75% to Warren. [5] And they found that $ 75,000 [*436] was reasonable compensation for Warren's past and future pain, mental anguish, lost earning [**6] capacity, disfigurement, physical impairment, and medical care.

> 4   Affiliated is not a party to this appeal.
> 5   No allegation of error pursuant to Chapter 33 of the Texas Civil Practice & Remedies Code Annotated (Vernon 1986 & Supp. 1997) is made, presumably since *Texas Labor Code section 406.033(a)*, *supra*, provides that contributory negligence by Warren is not a defense.

Allsup filed a motion for judgment notwithstanding the verdict. The basis of the motion was a lack of any evidence concerning negligence or causation.

The trial court denied the motion and rendered judgment on the verdict. The judgment provides for Warren's recovery of $ 33,490, [6] together with pre- and post-judgment interest and costs of court against Allsup.

6    This figure represents the jury award less offsets for medical expenses previously paid by Allsup and stipulated to by Warren.

[**7] The genesis for this appeal is the denial of Allsup's motion for judgment notwithstanding the verdict. Allsup contends the motion should have been granted because there was no evidence presented concerning (1) negligence, (2) proximate cause, or (3) causal connection.

Warren responds that there was some evidence of negligence, proximate cause and causal connection. Specifically, she represents that in connection with her pleaded acts of negligence,

2 and 7, Allsup failed to provide her adequate assistance in unloading Affiliated's trucks;

3, Allsup failed to properly train her in lifting the boxes from the trucks;

4, Allsup failed to provide a loading dock for the unloading of the trucks; and

5, Allsup failed to provide her with a back brace or safety belt. [7]

7    With respect to her sixth allegation of negligence, Warren concedes that there was no evidence of the OSHA standards and, hence, no evidence of their violation.

Warren concludes that since it was medically [**8] evidenced that she received injuries on the dates alleged, it was within the province of the jury to sift through the evidence and arrive at its own conclusions, *Texas Rule of Civil Procedure 226(a)*, which are not to be disturbed. *Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987)*.

Of course, the jury was entitled to draw its own conclusions from the evidence, provided there was evidence to support its findings. *Id*. In our own examination of the contentions of no evidence, we must review the entire record to determine whether there is more than a scintilla of evidence to support the findings, *Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*, and if there is, we must uphold the findings. *Stedman v. Georgetown S. & L. Ass'n, 595 S.W.2d 486, 488 (Tex. 1979)*. Evidence is merely a scintilla when it is so weak as to do nothing more than create a mere surmise or suspicion of a fact. *Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752, 755 (Tex. 1970)*. We must consider only the evidence and the reasonable inferences which can be drawn therefrom in their most favorable light to support the jury's findings while disregarding all contrary evidence and inferences. *Browning-Ferris,* [**9] *Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993)*. If there is some evidence in the record to support the jury's findings, the challenge to the legal sufficiency will fail. *Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 541 (Tex. 1981)*.

To be successful in her allegation of negligence, Warren must have marshalled some evidence to show (1) a legal duty owed her by Allsup, (2) that Allsup breached that duty, and (3) that the breach was the proximate cause of damages. *El Chico Corp. v. Poole, 732 S.W.2d 306, 311 (Tex. 1987)*. The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence. *Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990)*. The lack of evidence to show a breach of a legal duty owed Warren is the premise of Allsup's initial contention of error.

The mere occurrence of an event causing injury is not evidence of negligence. *Farriell v. Davis, 606 S.W.2d 344, 345* (Tex.Civ.App.--Eastland 1980, no writ). Thus, negligence or a failure to perform a duty required by law is never presumed as a fact, [*437] but must be proved by evidence. *Wells v. Texas Pacific Pole and Oil Company, 140 Tex.* [**10] *2, 164 S.W.2d 660, 662 (1942)*. The burden of proving it is on the party seeking a recovery of damages by reason of such negligence. *Jones v. Nafco Oil and Gas, Inc., 380 S.W.2d 570, 574 (Tex. 1964)*; *Trio Transport, Inc. v. Henderson, 413 S.W.2d 806, 812* (Tex.Civ.App.--Amarillo 1967, writ ref'd n.r.e.).

Given the premise that Allsup owed Warren a statutory duty to provide a safe work place pursuant to article 5182a, *supra*, we review the recorded evidence to ascertain whether it was evinced that the duty was breached in the manner alleged by Warren. If not, then, as the Supreme Court has held, "it is the duty of the trial court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere

surmise or suspicion of the existence of a fact sought to be established." *Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063 (1898).*

With regard to Warren's claim that Allsup was negligent in failing to provide her with assistance in unloading the trucks, she argues that it was Allsup's standard operating procedure for male employees to unload the trucks, that she was instructed by McDonald to schedule one of the men to unload the truck [**11] every time, and that when the males she had scheduled to unload the trucks did not report for duty, her call for assistance was unanswered. However, because Warren does not suggest that Allsup failed to adequately staff the stores, the argument is refuted by the evidence that Allsup did not control the movements of the store employees, but that it was Warren's sole responsibility to schedule the workers for duty, and by her admission that the failure of the employees to report for duty was not Allsup's fault. Absent evidence of a special relationship between Allsup and Warren which imposed a duty upon Allsup apart from Warren's to insure that the scheduled employees reported for duty, Allsup had no duty to control the scheduled employees' conduct. *Greater Houston Transp. Co. v. Phillips, 801 S.W.2d at 525.* Thus, without proof of this necessary element for Allsup's liability, Warren cannot prevail under her theory that Allsup was negligent in failing to provide her assistance in unloading the trucks. *Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 720 (Tex. 1995).*

Although Warren, in support of her allegation that Allsup was negligent in failing to properly train her, testified [**12] to the legal conclusion that she was not trained in lifting heavy items, the testimony was not validated by the evidence. Warren disclosed her familiarity with Allsup's Safety Manual, which directs that all personnel be instructed in proper lifting procedures as shown in its text and diagrams, but she could not recall following any of the lifting procedures outlined in the manual. Undisputed is the testimony of McDonald that he demonstrated to Warren how to unload a truck, including milk boxes, and unloaded her first truck with her, showing her how to unload it. Warren admitted that she was physically capable of unloading an Affiliated truck, that she had unloaded the trucks since she became manager, and that there was nothing unusual about what she had to do in unloading the trucks.

What is missing from the record to sustain Warren's claim is evidence of any training beyond that given Warren for lifting items from the truck which would be necessary or proper by a reasonably prudent employer. Warren's bald conclusion that she was not properly trained in lifting heavy items does not, without more, supply that evidence. It was her burden to provide factual proof of the training that [**13] Allsup negligently

failed to provide, *Jones v. Nafco Oil and Gas, Inc., 380 S.W.2d at 574,* but she did not provide that proof.

Warren claimed, apparently in connection with Allsup's nondelegable duty to furnish her with reasonably safe instrumentalities with which to work, *Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, 401 (1934),* [8] that Allsup did not provide her with a back brace or belt for lifting the [*438] merchandise off the delivery trucks, or provide a loading dock. Her testimony, and that of McDonald, was consistent that neither was provided.

> 8 An unrelated portion of the opinion in this cause was disapproved in *Wright v. Gifford-Hill & Co., Inc., 725 S.W.2d 712, 714 (Tex. 1987).*

However, Warren admittedly never requested Allsup to provide a back brace or safety belt for the lifting, nor did she complain of the unloading as unsafe on any occasion. Rather, she testified she had unloaded delivery trucks on other occasions without injury. Neither was there any evidence that [**14] a back brace or safety belt was commonly used in, or had been established by industry standards or customs as a safety measure for, unloading merchandise from trucks as was involved in this cause, or that a reasonably prudent employer would have provided such instrumentality. Nor was there any medical evidence that a back brace or safety belt would have prevented the injuries sustained by Warren.

In brief, because the evidence showed that the unloading of the trucks may be performed in the usual and proper way in safety without a protective back brace or safety belt, Warren did not evince that Allsup was under a duty to furnish the protective instrumentality. *St. Louis Southwestern Ry. Co. v. Weatherly, 2 S.W.2d 555, 558-58* (Tex.Civ.App.--Texarkana 1928, no writ). Absent a duty to furnish Warren a back brace or safety belt, Allsup could not be guilty of negligence for failing to do so. *Triplex Communications, Inc. v. Riley, 900 S.W.2d at 720.*

With respect to Warren's claim that Allsup was negligent in failing to provide a loading dock, it was undisputed that there was no room at either convenience store for a loading dock. The only evidence bearing on the comparison of a [**15] loading dock at another store with Allsup's stores was adduced by Warren's counsel's questioning of McDonald who, after testifying that he had worked at Buddies Food, a supermarket in Plainview, was asked and replied as follows:

> Q Did it have a dock?

> A Yeah, at the back.

Q Who was their grocery supplier?

A Fleming.

* * *

Q They delivered by semi-truck?

A Yes, sir.

Q Just like Affiliated Foods?

A That's right.

Q Did they use unicarts or were they hand-stacked?

A I don't really know . . . .

Q Do you recall if at Buddies the goods off of a semi-truck would be unloaded onto the dock and then into the back of the store?

A I don't recall. I believe I recall seeing unicarts, I think so.

Q Okay. In your opinion do you think the use of unicarts is safer than the use of hand-stacked loads (like the unloading of Affiliated trucks at Allsup)?

A No, I don't believe so. I have handled them both.

Q Is it easier to get items off of a truck and into the store in unicarts?

A I don't think it's any easier, I think its's --I just I don't [**16] like unicarts because I think unicarts are dangerous.

No other meaningful evidence concerning a loading dock was offered.

This evidence does not raise the issue whether Allsup failed to provide Warren a safe place to work because of the absence of a loading dock. The fact that a supermarket in another town had a loading dock does not, standing alone, establish that Allsup had a duty to provide a loading dock at its convenience stores, nor that Allsup was negligent for not providing a loading dock. That the convenience stores were an unsafe place to work may not be presumed from Warren's injuries; there must be proof that the absence of a loading dock was negligence, *Jones v. Nafco Oil and Gas, Inc., 380 S.W.2d at 574*, which is lacking in this record.

Because the evidence failed to show that Allsup was negligent in any manner alleged by Warren, Allsup was entitled to have its motion for an instructed verdict granted. We, therefore, sustain Allsup's first point of error, which pretermits an address of its other points. Tex. R. App. P. 90(a).

[*439] Accordingly, the judgment is reversed and judgment is hereby rendered that Warren take nothing by her action against [**17] Allsup.

Charles L. Reynolds

Senior Justice

# APPENDIX – "D"



JAMES LERMON, Appellant/Cross-Appellee v. MINYARD FOOD STORES, INC.,
AND RODNEY LEE, Appellees

No. 05-13-00034-CV

COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS

*2014 Tex. App. LEXIS 12498*

**November 19, 2014, Opinion Filed**

**SUBSEQUENT HISTORY:** Rehearing denied by *Lermon v. Minyard Food Stores, Inc., 2014 Tex. App. LEXIS 13957 (Tex. App. Dallas, Dec. 29, 2014)*
Petition for review denied by *Lermon v. Minyard Food Stores, Inc., 2015 Tex. LEXIS 598 (Tex., June 19, 2015)*

**PRIOR HISTORY:** [*1] On Appeal from the County Court at Law No. 1, Dallas County, Texas. Trial Court Cause No. CC-10-02955-A.

**COUNSEL:** For Appellants: Curtis L. Marsh, Bruce K. Thomas, Thomas D. Malone, Dallas, TX.

For Appellees: David E. Keltner, Matthew d. Stayton, Marianne Marsh Auld, Fort Worth, TX; David Hill Bradley, Houston, TX.

**JUDGES:** Before Justices O'Neill, Lang-Miers, and Evans. Opinion by Justice O'Neill.

**OPINION BY:** MICHAEL J. O'NEILL

**OPINION**

**MEMORANDUM OPINION**

Opinion by Justice O'Neill

James Lermon sued Minyard Food Stores and Rodney Lee (collectively Minyard) for malicious prosecution, negligence, and gross negligence. A jury found in Lermon's favor on all claims and awarded Lermon $830,000 in actual damages and $115,000 in punitive damages on his malicious prosecution claim and $175,000 in actual damages and $1 million in punitive damages on his negligence and gross negligence claims.

The trial court rendered judgment on Lermon's malicious prosecution claim.

In his appeal, Lermon contends the trial court erred in failing to enter judgment on the jury findings affording him the greatest recovery. In its cross-appeal, Minyard contends the evidence is both legally and factually insufficient to support Lermon's claims for malicious prosecution, negligence, and gross negligence. It also challenges the jury's award of actual and punitive damages. We conclude the evidence is legally insufficient to support the jury's verdict on Lermon's [*2] claims. Accordingly, we reverse the trial court's judgment and render judgment that Lermon take nothing.

Background

At 4:11 a.m. on September 4, 2006, $76,000 was stolen from the safe of a Carnival grocery store owned by Minyard. Surveillance videos taken at the store showed the thief entering and exiting the store as well as the actual theft. The thief, however, used an umbrella to shield his face from the camera's view. The thief had a key to the store and knew the store's alarm code and the combination of the safe. The thief was also able to quickly locate the alarm and the safe and then retrieve the cash deposit, suggesting the theft was an inside job. In the months prior to the theft, two similar thefts occurred at other stores owned by Minyard.

Minyard immediately reported the offense to Plano police. Detective Jeff Dalton investigated. Minyard also conducted its own internal investigation, led by its vice-president of loss prevention, Rodney Lee, who was assisted by loss prevention investigators Susan Caldwell and Bobby LaJuett. During the course of Minyard's investigation, Lee provided information to Detective Dalton and ultimately identified the thief as Lermon, who

had recently [*3] retired from Minyard. A grand jury later indicted Lermon for the offense and the Collin County District Attorney's Office tried him for the offense. Lermon's first trial ended in a mistrial. The DA tried Lermon a second time, resulting in his acquittal. Lermon then brought this suit for malicious prosecution, negligence, and gross negligence against Minyard and Lee asserting they were responsible for the damages he suffered from the criminal prosecution.

To show Minyard and Lee maliciously prosecuted him, Lermon relied on certain information Lee gave to Detective Dalton, which Lermon asserts Lee knew was false. In particular, Lermon relies on a September 12, 2006 "Voluntary Statement" and a September 15, 2006 memo addressed to Detective Dalton.

In the September 12, 2006, "Voluntary Statement," Lee stated:

> Following an investigation of a stolen cash deposit at our Carnival Foodstore #129 on 9/4/06 we determined the suspect to be an ex-employee James Lermon. After reviewing video and still shots and visiting with Mr. Lermon on 9/8/06 it is clear he is the person in the pictures. (Additionally, Mr. Lermon misrepresented several aspects of information pertaining to his returning store keys [*4] upon his retirement 8/3/06) Mr. Lermon worked at this location as a "fill-in" Asst. Mgr. in 6/06 and had previously worked as an Asst. Mgr. prior as well. Mr. Lermon would have had the safe combination and alarm codes when he worked at this store in June. After reviewing all evidence/information I am convinced this is Mr. Lermon who committed this crime.

In the September 15, 2006 memo, Lee provided Detective Dalton a "Case Narrative" of the theft. In it, he included further details of his investigation. Lee stated that immediately after the theft, he and loss prevention investigators Caldwell and LaJuett were called to the store. He said after reviewing the surveillance video, the suspect immediately appeared "familiar" to them, but it was difficult to identify the suspect from the video. He said they compiled a list of all management that had access to the store's alarm code since it changed in April 2006, and then excluded all non-white individuals because the suspect in the video was clearly an older white male. They then requested a Fort Worth police officer to "clean-up" the video and provide still shots of the thief. They were able to obtain clearer images, but Minyard sent the [*5] hard drive to a private company in an effort to obtain even clearer shots.[1]

> 1    The company was unable to obtain better images.

Lee further stated that on September 6, 2006 (two days after the theft), the Carnival store received a set of manager's keys for that store in an interoffice envelope. The handwriting on the envelope was identified as Lermon's. Lee stated Lermon had retired from Minyard on August 3, 2006, but would have had access to both the store's safe combination and the security alarm code because he had worked at the store since the alarm code changed.

Lee stated he went to Lermon's home and asked him about the keys. Lermon confirmed the handwriting on the interoffice envelope was his. Lermon told Lee he had returned the keys to a Sack 'N Save (a Minyard owned store) on September 2, 2006 (two days prior to the theft) when he went to that store to pick up a prescription. Lee said he confirmed Lermon had in fact returned the keys on September 2, giving them to a cashier. However, Lermon did not pick up a prescription on that date and the last time he had picked up a prescription from that location was August 19, 2006.

Lee also stated that after he spoke to Lermon, he "took note [*6] of his shaggy white beard" and "longer than normal" white hair, which "confirmed what we saw in the video."[2] Lee concluded his memo by stating all known evidence, employee statements, photographs, and videos had been turned over to Detective Dalton.

> 2    Lee had previously told Caldwell that it looked like the thief might be wearing a hair net and beard net.

About a month after Lee's memo and voluntary statement, Detective Dalton prepared a probable cause affidavit requesting a warrant for Lermon's arrest. In his affidavit, Dalton states that he "has good reason to believe and does believe" that Lermon committed the theft. With respect to the thief's identity, Dalton stated James Luna, the manager that opened the store the morning after the theft, told him that he had watched the surveillance video with loss prevention investigators and that the thief "looked like" Lermon to him. Dalton also said Lee gave him a copy of the store's surveillance video. Detective Dalton watched the video and said it showed a white male that appeared to have white hair and a beard.

Detective Dalton said that although the man used an umbrella to shield his identity, still pictures obtained from the video captured [*7] the back and the side of the thief's head. Finally, Detective Dalton stated that Lee had told him that he had known Lermon for twenty

years, Lee reviewed the surveillance video and still photographs taken from the video, and the man on the video was Lermon.

A magistrate issued a warrant for Lermon's arrest based on Detective Dalton's affidavit, and Dalton filed the case with the DA's office. When he did so, Detective Dalton gave the DA's office his "summary" of the charges. In the summary, Dalton states, among other things, that Lee "believed" Lermon had used an "old key" that he had not returned upon retirement to unlock the door of the store.

William Coleman Sylvan, the lead prosecutor in Lermon's second trial, testified for Minyard. According to Sylvan, he had a "good" case against Lermon and it "was a case [he] believed in and believed needed to be prosecuted."Sylvan also testified that at no time during his prosecution of the case did he believe Minyard was acting maliciously toward Lermon, nor did he believe Minyard was trying to cause Lermon to be prosecuted. Further, Sylvan testified that before a prosecutor takes a case to trial, he has to evaluate it on his own to determine [*8] whether it has merit. He said if he had the sense that Minyard was trying to falsely prosecute Lermon, he would not have gone forward with the case.

On cross-examination, Sylvan said he knew a "significant portion" of information obtained by Detective Dalton about the theft came from Lee. Sylvan also acknowledged that the statement in Detective Dalton's summary -- that Lee believed Lermon used an old key to enter the store that he failed to return upon retirement -- would have been a "factor" in deciding whether to prosecute. However, Sylvan also testified that Lee had told him before Lermon's second trial that Lermon had returned the keys before the theft. Sylvan could not remember exactly what Lee said about the timing of the key's return, but he knew the keys had been returned. Sylvan also testified he personally reviewed the videotape of the crime. On re-direct, Sylvan testified he still would have felt he had a good case even if he was not presented information about the key.

Because the issues raised in Minyard's cross-appeal are dispositive, we address them at the outset. In its first issue, Minyard asserts there is no evidence to support Lermon's claim for malicious prosecution [*9] because the decision to prosecute Lermon was made by law enforcement officials and Lermon did not otherwise show Minyard or Lee initiated or procured the prosecution. We agree.

Malicious Prosecution

The tort of malicious prosecution creates a unique tension between important competing societal concerns. *See Browning-Ferris Indus. v. Lieck, 881 S.W.2d 288,* 290 (Tex. 1994). Specifically, a plaintiff's right to recover damages for being subjected to unjustified criminal proceedings must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived. *Kroger Tex. Ltd. P'ship v. Suberu, 216 S.W.3d 788, 792 (Tex. 2006).* Thus, a plaintiff must prove not only that the defendant commenced criminal proceedings against him and he is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward him. *Id.* These latter elements guard against a jury's natural inclination to punish those who, through error but not malevolence, commence criminal proceedings against a person who is ultimately exonerated. *Id.*

To prove causation, a plaintiff must specifically show the defendant "initiated or procured" the criminal prosecution. *See Lieck, 881 S.W.2d at 292-93; Dangerfield v. Ormsby, 264 S.W.3d 904, 910 (Tex. App.--Fort Worth 2008, no pet.).* A defendant "initiates" a prosecution when it files "formal charges" against the plaintiff. *See Lieck, 881 S.W.2d at 293; Dangerfield, 264 S.W.3d at 910.* A person "procures" [*10] a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Lieck, 881 S.W.2d at 292.* Procurement generally requires that a person's actions be both a "necessary and a sufficient cause of the criminal prosecution." *Id.*

Generally, a person cannot be held liable for malicious prosecution if the decision whether to prosecute is left to the discretion of law enforcement officials. *King v. Graham, 126 S.W.3d 75, 76 (Tex. 2003)* (per curiam). An exception exists if the person provides information to those officials which he knows is false. *Id.* In such cases, the plaintiff must further prove the false information caused the criminal prosecution by proving the decision to prosecute would not have been made but for the false information supplied by the defendant. *Id.*

Actions for malicious prosecution are not favored in the law and therefore we strictly adhere to the tort's carefully defined elements. *Luce v. Interstate Adjusters, Inc., 26 S.W.3d 561, 566 (Tex. App.--Dallas 2000, no pet.)* Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct. *Lieck, 881 S.W.2d at 291.*

Standard of Review

An appellant attacking the legal sufficiency of an adverse finding on [*11] an issue on which it did not have the burden of proof must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.1983); Affordable Power, L.P. v. Buckeye Ventures, Inc., 347 S.W.3d 825,*

*830 (Tex. App.--Dallas 2011, no pet.).* A "no evidence" point must be sustained when the record discloses (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex.2005).*

When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id. at 822.* Evidence is legally sufficient if it rises to a level that would enable a reasonable and fair-minded jury to make the finding. *Id. at 810.* In making this determination, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. *Id. at 812.* We do not consider the evidence "in isolated bits and pieces divorced from its surroundings; it must be viewed in its proper context with other evidence." *AutoZone, Inc. v. Reyes, 272 S.W.3d 588, 592 (Tex.2008).*

Evidence that is "so weak as to do no more [*12] than create a mere surmise or suspicion" of a fact is not legally sufficient evidence that the fact exists. *Kroger Tex. Ltd. P'ship, 216 S.W.3d at 793*(quoting *Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004)).* If a claim is supported by only meager circumstantial evidence, the evidence does not rise above a scintilla if jurors would have to guess as to whether a vital fact exists. *City of Keller,168 S.W.3d at 813.* When circumstances are equally consistent with either of two facts, neither fact can be inferred. *Id.* Additionally, an inference stacked only on other inferences is not legally sufficient evidence. *See Marathon Corp. v. Pitzner, 106 S.W.3d 724, 728 (Tex.2003)* (per curiam); *Sears & Roebuck Co. v. AIG Annuity Ins. Co., 270 S.W.3d 632, 637 (Tex. App.--Dallas 2008, pet. denied).*

Application

In this issue, Minyard asserts Lermon failed to show either it or Lee initiated or procured the prosecution. Lermon responds the evidence is sufficient to show Lee both initiated and procured the prosecution. Lermon first asserts Lee "initiated" the prosecution when he gave Detective Dalton a "Voluntary Statement" identifying Lermon as the thief with the "hope" that Detective Dalton would move forward to have Lermon arrested and prosecuted. To show such a statement can constitute a "formal charge," Lermon relies on this Court's opinion in *Kroger v. Suberu, 113 S.W.3d 588, 597 (Tex. App.--Dallas 2003), rev'd on other grounds, 216 S.W.3d 788 (Tex. 2006).*

In *Kroger*, a Kroger employee stopped the plaintiff for shoplifting. *Id. at 594-95.* The plaintiff was taken to an [*13] office and Kroger contacted police. *Id. at 595.* When police arrived, the plaintiff was told she had been accused of shoplifting and she was immediately arrested and taken to jail. *Id.* To show Kroger "initiated" the prosecution, the plaintiff relied on evidence that the Kroger store manager had told police on their arrival that Kroger "wanted to prosecute" and that the manager signed "the report or whatever they had [him] sign" on behalf of Kroger. *Id. at 597.* We concluded the jury could have determined from that evidence that Kroger had "filed a formal charge" against the plaintiff.[3] *Id.*

> 3 We further concluded that, even if the plaintiff failed to show Kroger initiated the prosecution, there was sufficient evidence that it procured the prosecution. *See Kroger, 113 S.W.3d at 597.*

In this case, the record before us contains the "Voluntary Statement" that Lermon asserts was used to initiate his prosecution. The witness statement is not a "formal charge" nor did it actually operate to initiate the criminal prosecution. Instead, the record shows Detective Dalton initiated the prosecution when he "formally charged" Lermon by presenting his own probable cause affidavit to a magistrate. *See Restatement (Second) of Torts § 653 cmt. c (1977)* ("Criminal proceedings are initiated by [*14] making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused."); *see also Lieck, 881 S.W.2d at 292-93.* In reviewing a sufficiency complaint, we cannot disregard undisputed evidence that supports only one conclusion. *See City of Keller, 168 S.W.3d at 814.*

Minyard next asserts there is no evidence that it or Lee "procured" Lermon's prosecution because the undisputed evidence shows the decisions to arrest and prosecute Lermon were made by law enforcement officials. *King, 126 S.W.3d at 76.* Here, unlike many malicious prosecution cases, it is undisputed Minyard was the victim of a felony theft. Detective Dalton investigated that theft for Plano police, and ultimately filed an affidavit in which he swore that he believed and had good reason to believe that Lermon committed the crime. *See TEX. CODE CRIM. PRO.2.13(a)(b)(1) (West 2005)* (peace officers have a duty to preserve the peace and to prevent and suppress crime). The DA's office also investigated the offense and twice made the decision to pursue criminal charges against Lermon. *See TEX. CODE CRIM. PRO.2.01 (West 2005)* (the primary duty of prosecuting attorneys is not to convict, but to see that justice is done).

Lermon nevertheless [*15] asserts he presented sufficient evidence that Dalton and the prosecutors based

their decisions to prosecute on false information provided by Lee. First, he asserts their decisions were based on Lee's false identification of Lermon as the thief. An honest mistake in identifying a suspect is insufficient to hold the reporting party responsible in damages. *Cf. Schnaufer v. Price, 124 S.W.2d 940, 942 (Tex. Civ. App.--Waco 1939, writ ref'd)* (false imprisonment case); *see also McHenry v. Tom Thumb Page Drug Stores, 696 S.W.2d 664, 665 (Tex. App.--Dallas 1985, writ dism'd)*; *Yianitsas v. Mercantile Nat'l Bank, 410 S.W.2d 848, 851 (Tex. Civ. App.--Dallas 1967, no writ)*. But a person may be held liable if he willfully identifies the wrong person as the criminal for the purpose of having him arrested and prosecuted. *See Schnaufer, 124 S.W.2d at 942*. According to Lermon, Lee did just that, by identifying him as the thief, knowing he was innocent.[4]

4 He asserts Lee's motive for doing so was to "save his job" by solving the three thefts that occurred "on his watch" and to try to obtain restitution for Minyard from Lermon. The only evidence he directs us to support these motives is that the thefts occurred and that Lee made inquiries to prosecutors about the possibility of obtaining restitution for Minyard. This evidence is entirely, if not more, consistent with an honest belief that Lermon was the thief.

To show Lee identified Lermon knowing he was innocent, Lermon asserts the surveillance video [*16] showing the thief --when compared to photographs taken of him at the same location -- establishes Lee could not possibly have honestly believed Lermon was the thief. Specifically, he asserts the thief did not "look like" him because he wears glasses and is tall, but the thief was not wearing glasses and was "a full head shorter."

After reviewing the video and the photographs, we cannot agree they constitute any evidence that Lee *knew* it was not Lermon on the video. First, evidence the thief was not wearing glasses does not establish the thief did not "look like" Lermon or otherwise constitute any evidence that Lee must have known the person on the tape was not Lermon.[5] Second, the surveillance video and photographic evidence do not depict a height discrepancy so dramatic that would allow a jury to reasonably find (1) Lee would have been able to perceive the discrepancy from reviewing the video, (2) Lee did in fact perceive the discrepancy, and (3) cognizant of the discrepancy, Lee nevertheless identified Lermon to Detective Dalton anyway. Indeed, even Lermon's own brother-in-law, when asked to identify the differences in appearance between the thief and Lermon, responded "maybe some height, [*17] maybe some weight." Lermon himself -- knowing Lee had identified him -- testified that that he was not aware of any "false" information Lee gave authorities.

Further, Detective Dalton and the prosecutors had the video before them and could determine for themselves whether Lermon's appearance was consistent with the thief's.

5 Not only can glasses be easily taken on and off, a person's need for glasses can change over time. Indeed, by the time of trial, Lermon himself no longer required glasses, having had cataract surgery.

Lermon also contends Lee's identification constituted "false information" because Lee claimed to be certain. Lermon asserts the jury could have inferred Lee was not merely mistaken, but was lying, because the tape showed any certainty would have been impossible. Even if we could agree that a witness's level of certainty in identifying a suspect could constitute false "information," the record shows Lee told Detective Dalton he could not make a positive identification on his initial review of the videotape. Lee's subsequent positive identification was based on what he had initially perceived about the thief's stature, walk, and gait, in addition to his later review of still [*18] shots and his discovery that Lermon had grown his hair and a beard since his retirement. Further, Detective Dalton and prosecutors could determine for themselves whether they believed a positive identification was possible from the video. We conclude evidence of Lee's positive identification is legally insufficient to show Dalton or prosecutors based their discretionary decisions to prosecute Lermon on information Lee provided and that Lee knew was false.

Lermon also asserts Lee gave Detective Dalton false information when he stated in his "Voluntary Statement" that Lermon misrepresented "several aspects" about his return of the keys to Minyard. To show this statement was both false and Lee knew it was false, Lermon relies on Lee's testimony at trial that the only misrepresentation Lee could remember was Lermon's claim that he had returned the keys to the store on the same date he picked up a prescription. According to Lermon, because Lee could remember only a single misrepresentation, his testimony shows his prior claim that there were "several" was knowingly false. We cannot agree Lee's testimony supports such an inference.[6] Moreover, Lermon has wholly failed to show that but for Lee's [*19] vague allegation regarding Lermon's return of the keys, either Detective Dalton or the district attorney would not have made the decision to prosecute Lermon. *King, 126 S.W.3d at 78-79*.

6 We note the record shows that Lee obtained his information regarding Lermon's return of the keys from Lermon himself and from the cashier, April Beard. Lermon also had failing memories

concerning his conversation with Lee about the keys and could not remember telling Lee he returned the keys on a specific date, but vaguely remembered saying something about returning the keys at the same time he picked up a prescription from the Sack 'N Save. Lermon's brother-in-law, who worked at the same Sack 'N Save, testified Beard told him she had mistakenly told Lee that Lermon returned the keys on September 2, 2006 instead of August 19, 2006. Although both dates were prior to the theft, the focus on the date was apparently to show Lermon returned the keys at his first convenience after he retired and to show it was not suspicious that the keys arrived at the store two days after the theft.

Lermon also contends he presented evidence Lee gave Detective Dalton information he knew was false when Lee told Detective Dalton Lermon had a key [*20] to the store at the time of the theft, when Lee knew Lermon had returned the key. To show Lee gave Dalton this false information, Lermon relies on the summary Detective Dalton gave to the district attorney in which Dalton states that Lee believed Lermon used an "old key" to unlock the door of the business, which he did not return upon retiring. But in Lee's prior September 15, 2006 memo to Detective Dalton, Lee clearly informed Dalton that Lermon returned his keys to the store before the theft. Further, Lermon has again failed to show that but for this information, either Detective Dalton or the district attorney would not have made the decision to prosecute Lermon. *King, 126 S.W.3d at 78-79* (testimony from investigative officer that false information "could possibly" have influenced his investigation is insufficient to show the decision to prosecute would not have been made but for the false information). Indeed, Sylvan testified he knew before Lermon's second trial that Lermon had returned the keys before the theft. Yet, he proceeded with the prosecution anyway.

Finally, Lermon contends there is evidence Lee procured the prosecution by "failing to disclose" material facts. To support his contention that [*21] a failure to disclose information can support a malicious prosecution claim, Lermon relies on dicta in the Supreme Court's opinion in *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 519 (Tex. 1997)*. In that case, the Supreme Court stated "failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are *relevant* to the malice and causation elements of a malicious prosecution claim but have no bearing on probable cause." *Richey, 952 S.W.2d at 519*(emphasis added); *but see Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.2d 502, 510 (Tex. 2002)* (evidence of a failure to disclose cannot support claim for false imprisonment because a plaintiff must prove defendant knowingly provided false information).

Assuming a "knowing failure" to disclose could support a claim for malicious prosecution, the jury in this case was charged, without objection, that it was required to find Lee provided information that he knew was false, not that he failed to disclose information. We must therefore measure the sufficiency of the evidence by the charge as given. *St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 530 (Tex.2002)*; *Noell v. City of Carrollton, 431 S.W.3d 682, 709 (Tex. App.--Dallas 2014, pet. ref'd)*. As a consequence, evidence Lee failed to disclose information to Dalton cannot support the jury's verdict. *See Wal-Mart Stores, Inc., 92 S.W.3d at 510* (failing to make a full and fair disclosure is not the equivalent of knowingly providing false information).

Moreover, Lermon failed [*22] to show Lee knowingly failed to disclose material information or that Dalton would not have made the decision to prosecute had he been aware of any information that was not actually disclosed. According to Lermon, Lee failed to disclose that: (1) Lermon was "much taller" than the perpetrator and wore glasses, (2) Lee had initially believed two other employees had provided the store keys and codes to the thief, (3) Lee did not question Lermon about the theft or determine whether he had an alibi, (4) the last time Lermon had worked at the store prior to June 2006 was over ten years before the theft, (5) Minyard did not keep track of who had access to keys to the store, and (6) Lermon returned the keys to the store before the theft.

To show this information was not disclosed in the first instance, Lermon appears to rely on Lee's failure to include the information in his Voluntary Statement and the memo containing Lee's "Case Narrative" that followed. We first note that although Lermon's claim required him to show the reason Dalton decided to prosecute and Dalton investigated the offense for two months, Lermon did not call Dalton as a witness or otherwise attempt to show what information [*23] Dalton had acquired before he obtained the warrant. The record does show however that Dalton was given photographs of Lermon wearing glasses. The record also shows that Lee told Dalton two other employees were suspected in the theft. Lee also told Dalton that Lermon had returned the keys to the store before the theft. Even if we could conclude Lermon presented sufficient proof that Lee failed to disclose information, we cannot agree the evidence supports a reasonable inference that Dalton would not have prosecuted Lermon but for Lee's failure to disclose.

We conclude there is no evidence to show Minyard or Lee initiated or procured Lermon's criminal prosecution and therefore there is no evidence to support Lermon's malicious prosecution claim.

Negligent Hiring, Retention, Training, and Supervision

Minyard also asserts the evidence is legally insufficient to support Lermon's direct negligence claim against it. Lermon sued Minyard asserting it was negligent in hiring, retaining, training, and supervising Lee. To support these claims, Lermon relied on evidence that Minyard did not adequately train Lee to perform the duties he was performing when he investigated the theft and did not adequately [*24] supervise Lee during his investigation.[7]

> 7   The Supreme Court has yet to rule definitively on the "existence, elements, and scope of [causes of action for negligent retention and supervision] and related torts such as negligent training and hiring." *See Waffle House, Inc. v. Williams, 313 S.W.3d 796, 804 (Tex. 2010).* The Supreme Court has, however, indicated that to recover, a plaintiff must show "more than just negligent hiring practices;" he must also present evidence of harm caused by the employee's misconduct." *Wansey v. Hole, 379 S.W.3d 246, 247 (Tex. 2012).* In doing so, it cited opinions from our sister courts holding a plaintiff must prove, in addition to the employer's negligence, an actionable tort by the employee. *See id.* (citing *Brown v. Swett & Crawford of Tex., Inc., 178 S.W.3d 373, 384 (Tex. App.--Houston [1st Dist.] 2005, no pet.)*; *Gonzales v. Willis, 995 S.W.2d 729, 739 (Tex. App.--San Antonio 1999, no pet.)*, overruled in part on other grounds by *Hoffmann--La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 447-48 (Tex. 2004)*; *Mackey v. U.P. Enters., Inc., 935 S.W.2d 446, 459 (Tex. App.--Tyler 1996, no writ).* Here, the jury charge did not require the jury to first find Lee committed a tort before finding Minyard negligent. Although Minyard complains the trial court erred in submitting a separate "damages" question based on Minyard's negligence, it does not complain that the charge did not predicate the question regarding Minyard's negligence on a finding of Lee's tortious conduct. Because we conclude there is no evidence of negligence, we need not consider Minyard's complaint regarding the separate damages question. [*25]

To sustain a cause of action for negligence it is necessary to produce evidence of a duty, a breach of that duty, proximate cause and damages. *Colvin v. Red Steel Co., 682 S.W.2d 243, 245 (Tex. 1984).* Here, the duty Minyard owed Lermon was to act as a reasonably prudent grocery store chain would act under the same or similar circumstances regarding any reasonably foreseeable risk. *See id; see also Rosell v. Central W. Motor*

*Stages, Inc., 89 S.W.3d 643, 652 (Tex. App.--Dallas 2002, pet. denied)*; *TXI Transp. Co. v. Hughes, 224 S.W.3d 870, 902 (Tex. App.--Fort Worth 2007)*, *rev'd on other grounds*, *306 S.W.3d 230 (Tex. 2010).*

Negligent hiring, retention, supervision, and training claims focus on the employer's own negligence, not the negligence of the employee. *See Leake v. Half Price Books, Records, Magazines, Inc., 918 S.W.2d 559, 563 (Tex. App.--Dallas 1996, no writ).* An employer can be liable for negligence if its failure to use due care in hiring, retaining, training, or supervising an employee creates an unreasonable risk of harm to others. *See Leake, 918 S.W.2d at 563*; *Martinez v. Hays Const., Inc., 355 S.W.3d 170, 180 (Tex. App.--Houston [1st Dist.] 2011, no pet.).* To support a claim for negligent hiring or retention, a plaintiff must prove the employer hired or retained an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit. *Ogg v Dillard's, Inc., 239 S.W.3d 409, 420 (Tex. App.--Dallas 2007, pet. denied).* To support a claim for negligent training and supervision, a plaintiff must prove that a reasonably prudent employer would have provided training and supervision beyond that which was given and the failure to do so caused his injuries. *See Patino v. Complete Tire, Inc., 158 S.W.3d 655, 661 (Tex. App.--Dallas 2005, pet. denied)*; *Dangerfield, 264 S.W.3d at 912*; *see Allsup's Convenience Stores, Inc. v. Warren, 934 S.W.2d 433, 437 (Tex. App.--Amarillo 1996, writ denied).*

On appeal, [*26] Minyard asserts Lermon failed to present any evidence of a standard of care or that it breached any such standard of care. Minyard specifically asserts Lermon failed to show it did not act as a reasonably prudent grocery store chain would have under the same or similar circumstances. Lermon responds he was not required to present any expert testimony or "other testimony" to establish a standard of care because the jury was charged on the "ordinary care" standard.

Regardless of whether Lermon had to present express testimony on the standard of care, Lermon had the burden to present sufficient evidence that Minyard did not use the degree of care a grocery store chain owner of "ordinary prudence" would use "under the same or similar circumstances." *Cf. Jackson v. Axelrad, 221 S.W.3d 650, 656 (Tex. 2007)* (ordinary care standard requires jury to consider defendant's circumstances and superior skills); *Townsel v. Dadash, Inc., No. 05-10-01482-CV, 2012 Tex. App. LEXIS 3185, 2012 WL 1403246, at * 3 (Tex. App.--Dallas April 24, 2012, no pet.)*; *TXI Transp. Co., 224 S.W.3d at 902.* We conclude he failed to do so.

The only evidence in the record concerning Lee's qualifications and training came from Lee. He testified that he started working for Minyard in 1975 packing

groceries and soon began doing other jobs inside the store. Later, he worked in the corporate offices in human [*27] resources. In 1987 or 1988, Lee was transferred to loss prevention. Lee had no "formal education" in law enforcement and was never given any "formal training" in investigation techniques. Lee said he was, however, given on-the-job training in loss prevention. Specifically, when Lee was first transferred to loss prevention, he began by sitting through investigations with a loss prevention manager. Lee later conducted his own investigations under the supervision of a manager. After four or five years, Lee became a loss prevention manager himself. Lee was ultimately promoted to vice-president of loss prevention, the position he held when he made the accusations against Lermon.

At that time, Lee's supervisor was Alan Vaughn, Minyard's senior vice-president of risk management. Lee said Vaughn did not conduct any interviews, take any photographs, or otherwise have any "hands-on" involvement in the investigation of the theft. Lee testified that Vaughn was, however, involved on a day-to-day basis overseeing what Lee was doing. Lee did not, however, provide any written reports to higher management during his investigation.

According to Lermon, the jury could have found Minyard did not exercise [*28] ordinary care in hiring, retaining, training, or supervising Lee because Lee had no "formal" training or education in "law enforcement" or "investigation techniques." Lermon's claim is premised on his contention that some specialized training or skill was necessary to give Lee the expertise necessary to perform his job duties. Lermon, however, has failed to show what kind of "formal" training a business exercising ordinary prudence would provide its loss prevention investigators. For example, there is no evidence showing what kind of "formal" training is available or commonly used in the industry or to show how any such "formal" training would have been superior to on-the-job training or would have reduced the risk of harm to third parties.

We also conclude Lermon has failed to present any evidence that Minyard failed to use ordinary care in supervising Lee. According to Lermon, the jury could have found Minyard was negligent because Lee's supervisor did not have any "hands on" involvement in the investigation, and Lee did not give written reports to management during the investigation. Lee, however, had nearly twenty years of experience in loss-prevention and was himself a vice-president [*29] and supervisor. Lermon has directed us to no evidence showing Minyard had any prior notice that Lee was unfit or incompetent to perform his job duties or should have been more closely supervised. We conclude Lermon failed to present any evidence a reasonably prudent employer would have provided training or supervision to Lee beyond that which

Minyard provided. *See Patino, 158 S.W.3d at 661*; *Dangerfield, 264 S.W.3d 910*. We further conclude Lermon failed to present any evidence that a reasonably prudent employer would have been aware Lee was unfit or unqualified to perform his job duties. Thus, Lermon has failed to show Minyard was negligent. As a consequence, he has also failed to show gross negligence. *See Seaway Prods. Pipeline Co. v. Hanley, 153 S.W.3d 643, 659 (Tex. App.--Fort Worth 2004, no pet.)*; *Ballesteros v. Jones, 985 S.W.2d 485, 500 (Tex. App.--San Antonio 1998, pet. denied)*.

Having concluded there is no evidence to support Lermon's claims, we do not reach the issues presented in Lermon's appeal, all of which concern damages. Minyard has, however, presented an issue requesting this Court to assess sanctions against Lermon under *Texas Rule of Appellate Procedure 45*. It asserts the issues raised in Lermon's appeal were frivolous and that Lermon could not have believed those issues would result in a rendition of a greater award of punitive damages in his favor. It further complains that Lermon's purpose in bringing the appeal, which he filed [*30] before the trial court had ruled on Minyard's motion for new trial and well before the notice of appeal was due, was to obtain the strategic advantage of being designated as the "appellant."

Under *rule 45*, after considering the record, briefs, or other papers filed in this Court, we may award a prevailing party damages if we objectively determine that an appeal is frivolous. *TEX. R. APP. P. 45*; *Smith v. Brown, 51 S.W.3d 376, 381 (Tex.App.--Houston [1st Dist.] 2001, pet. denied)*. An appeal is frivolous when the record, viewed from the perspective of the advocate, does not provide reasonable grounds for the advocate to believe that the case could be reversed. *Smith, 51 S.W.3d at 381*. The decision to grant appellate sanctions is a matter of discretion that an appellate court exercises with prudence and caution and only after careful deliberation. *Id*. Because our disposition of this case makes it unnecessary to review the merits of Lermon's appeal or consider the trial court's award of punitive damages, we will not consider whether the appeal was frivolous solely for the purposes of assessing sanctions.

Because Lermon failed to present legally sufficient evidence to support his causes of action, we reverse the trial court's judgment and render judgment that he take nothing on his claims.

/Michael J. O'Neill/ [*31]

MICHAEL J. O'NEILL

JUSTICE

**JUDGMENT**

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellant/cross-appellee James Lermon take nothing.

It is **ORDERED** that appellees/cross-appellants Minyard Food Stores, Inc. and Rodney Lee recover their costs of this appeal from James Lermon.

Judgment entered this 19th day of November, 2014.